# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-DP-00529-SCT

*MICHELLE BYROM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2000 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | TERRY LYNN WOOD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | JOHN RICHARD YOUNG |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 10/16/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     On October 21, 1999, Michelle Byrom (Byrom) was indicted for the capital murder of her husband, Edward Byrom, Sr. (Byrom, Sr.). A jury trial commenced on November 13, 2000, before the Circuit Court of Tishomingo County, the Honorable Thomas J. Gardner, III, presiding. On November 17, 2000, the jury found Byrom guilty of capital murder. Following the verdict, Byrom petitioned the court for a sentencing hearing before the judge, without a jury. After granting the petition, the trial court conducted a sentencing hearing and at the conclusion thereof, sentenced Byrom to death by lethal injection. After

Byrom's motions for a judgment notwithstanding the verdict, or in the alternative, a new trial were denied, Byrom timely filed a notice of appeal before this Court. The execution of the death sentence was stayed pending appeal.

**FACTS**

¶2.     In late May and early June 1999, Byrom began looking for someone to kill her husband. After attempting to hire at least one other person, Byrom contracted with Joey Gillis (Gillis) to kill Byrom, Sr. Byrom and Gillis negotiated a price of $15,000, which was to be paid from the victim's life insurance proceeds.  The Byroms' son, Edward Byrom, Jr. (Junior), who assisted his mother in finding a killer, was aware that Gillis had been hired to kill his father. Gillis attempted to kill Byrom, Sr. on two separate occasions prior to the murder. Both attempts went unnoticed by Byrom, Sr.

¶3.     Byrom suffers from Munchausen Syndrome[1] and had been intentionally ingesting rat poison for at least three years prior to the death of her husband.  On the morning of June 4, 1999, Byrom visited her physician, Dr. Ben Kitchens, who informed her that she had pneumonia and needed to go to the hospital.[2] Byrom, Sr. took off work and drove Byrom to the hospital.  He stayed at the hospital with Byrom for awhile, then left, promising to return after lunch.  Byrom, Sr. went home, told Junior what room his mother was in, and then went into his private room to watch television.  A few hours later, Byrom, Sr. was shot to death with his World War II relic Luger 9-millimeter pistol. There was no allegation or evidence of forced entry.

---

[1]People suffering from this disorder intentionally injure themselves in an attempt to garner sympathy. However, persons suffering from this disorder are different from malingerers in that Munchausen sufferers will be aware of their deceits but unaware of their motivations.

[2]Byrom also suffers from numerous other ailments, including: lupus, pneumonia, hip replacement, and severe depression.  Several of her health problems are a direct result of her ingestion of rat poison.

¶4.     According to Junior's and Gillis's statements, sometime after Byrom, Sr. informed Junior about his mother, Junior, accompanied by Gillis, left his house. Junior dropped Gillis off near a wooded area that led to a field beyond the Byrom home. Gillis was wearing a glove on his right hand and carrying the 9-millimeter pistol. Thirty minutes later, Junior picked Gillis up at the same location. Junior asked Gillis if his father had been killed, and Gillis said yes. When Junior asked if Gillis was the one who killed his father, Gillis indicated that he did not do it.[3] Junior and Gillis disposed of the glove and shirt that Gillis was wearing and hid the pistol. Junior took Gillis home, then traveled to the hospital and told Byrom that "it was done." Byrom told Junior to return home to make sure Byrom, Sr. was dead and to get him help if he was suffering. Junior went home and found his father dead. He then called 911 to report the murder.

¶5.     Upon arriving at the Byrom home, the Tishomingo County Sheriff Department personnel became suspicious of Junior. He had cuts on his knuckles, which he claimed to have received after he struck an interior door in anguish upon discovering Byrom, Sr.'s body. He also had blood on the back of his pants near his belt line and on the leg.[4] Junior was taken into custody to await questioning. He later confessed, implicating himself, Byrom, and Gillis in the murder.

¶6.     Through Junior's confession, law enforcement determined that Gillis had been in the company of Junior that day at the Byrom home. Gillis was located and taken into custody for questioning. He later confessed to his involvement in the murder as well as that of Byrom and Junior. However, he maintained that someone else had actually killed Byrom, Sr.

---

[3]Gillis claimed throughout that he was not the shooter; however, no physical evidence was ever discovered to indicate that anyone else was involved.

[4]The blood was later determined to be his own from the injury to his knuckles sustained when he punched an interior door after discovering his father's body.

¶7.     Rick Marlar, an investigator with the Criminal Investigation Bureau (CIB) of the Mississippi Highway Patrol (MHP), went to the hospital and conducted the first of five interviews with Byrom. She did not incriminate herself during this interview. Later that same night, Tishomingo County Sheriff David Smith went to the hospital and interviewed Byrom a second time. After being informed that Junior had "told everything," Byrom confessed, implicating herself, Junior, and Gillis in the murder. This and a subsequent statement were suppressed because of defective *Miranda* warnings. However, Byrom later gave two additional statements during which she revealed substantially the same incriminating information.

¶8.     As part of a plea agreement, Junior pled guilty to conspiracy to commit capital murder, accessory before the fact to grand larceny, and accessory before the fact to burglary with intent to commit assault. He also testified against his mother. Gillis, the alleged "trigger-man" whom Byrom purportedly promised to pay for the murder of her husband, pled guilty to accessory after the fact to capital murder and conspiracy to commit capital murder.

## DISCUSSION

¶9.     The standard for this Court's review of an appeal from a capital murder conviction and death sentence is abundantly clear. On appeal to this Court, convictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny." *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992) (citing *Smith v. State*, 499 So.2d 750, 756 (Miss. 1986); *West v. State*, 485 So.2d 681, 685 (Miss. 1985)).  Under this method of review, all doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Id.* (quoting *Irving v. State*, 361 So.2d 1360, 1363 (Miss. 1978)). *See also Fisher v. State*, 481 So.2d 203, 211 (Miss. 1985).   However, we take this opportunity to clarify here our

4

position regarding the cumulative effect of error, especially upon appellate review of a case (such as the one today) which results in a conviction of capital murder and imposition of the death penalty.

¶10.    In *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987) (rape conviction and life sentence affirmed), this Court, in individually addressing each assignment of error, found no error (harmless or otherwise) by the trial court.  In so finding, we stated:

> In sum, McFee contends that the cumulative effect of the alleged errors was sufficient to prejudice the jury, essentially allowing the State to convict him not of rape, but of murder.  Yet, as discussed, neither the introduction of the photographs nor the prosecutor's comments constituted reversible error.  As there was no reversible error in any part, so there is no reversible error to the whole.

*Id.*

¶11.    On the other hand, in *Jenkins v. State*, 607 So.2d 1171, 1183-84 (Miss. 1992) (capital murder conviction and death sentence reversed and remanded), in which this Court found both harmless error and reversible error by the trial court, we stated:

> If reversal were not mandated by the State's discovery violations, we would reverse this matter based upon the accumulated errors of the prosecution.
>
> This Court has often ruled that errors in the lower court that do not require reversal standing alone may nonetheless taken cumulatively require reversal.

*Id.* (citing *Griffin v. State*, 557 So.2d 542, 552-53 (Miss. 1990)).

¶12.    In *Manning v. State*, 726 So.2d 1152, 1198 (Miss. 1998) (capital murder convictions and death sentence affirmed), after addressing 21 assignments of error with sub-parts, and after making numerous findings of no "reversible error," we stated:

> This Court has held that individual errors, not reversible in themselves, may combine with other errors to make up reversible error.  *Hansen v. State*, 592 So.2d

114, 142 (Miss. 1991);[5] *Griffin v. State*, 557 So.2d 542, 553 (Miss. 1990). The question under these and other cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial. Where there is "no reversible error in any part, . . . there is no reversible error to the whole." *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).

We find that there is no cumulative error in this case warranting reversal.

726 So.2d at 1198.

¶13.   What we wish to clarify here today is that upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect. That having been said, for the reasons herein stated, we find that errors as may appear in the record before us in today's case, are individually harmless beyond a reasonable doubt, and when taken cumulatively, the effect of all errors committed during the trial did not deprive Michelle Byrom of a fundamentally fair and impartial trial. We thus affirm Byrom's conviction and sentence.

> **I.**    **WHETHER THE TRIAL COURT ERRED IN ORDERING COUNSEL FOR THE DEFENSE TO TURN OVER THE PSYCHIATRIC REPORTS OF BOTH DR. LOTT AND DR. CARUSO TO THE STATE, IN VIOLATION OF BYROM'S HER FIFTH AMENDMENT PRIVILEGE.**

¶14.   During a pretrial hearing on October 18, 2000, the trial judge ordered the defense to disclose to the State the reports of Dr. Criss Lott, a court-appointed psychologist, and Dr. Keith Caruso, a psychiatrist hired by Byrom after the trial court granted her request for a psychiatric expert. Both doctors, at Byrom's request, evaluated the state of her mental health. Byrom contends that disclosure of these two reports

---

[5]In *Hansen*, likewise a death penalty case, this Court found that the trial court had committed three errors during the guilt phase, but "we nonetheless hold the errors in this case, given their cumulative effect upon the penalty phase, harmless beyond a reasonable doubt." 592 So.2d at 153.

should not have been required until after a guilty verdict was returned and the sentencing phase began. She claims that this "early disclosure" violated her Fifth Amendment right against self-incrimination.

¶15.    In response, the State first points out that neither of these reports were used during the guilt phase of the trial, and thus, it argues, this point is moot. Alternatively, the State contends that the trial judge acted within his discretion as the evaluations were requested by Byrom and were mandatory disclosures under Mississippi's reciprocal discovery rules. The State also argues that Byrom's reference to an "early disclosure" is inaccurate because the trial judge deferred disclosure of the reports until less than one month before trial.

¶16.    On June 22, 2000, upon motion by the defense, the trial judge ruled that Dr. Lott would evaluate Byrom's competency to stand trial. Byrom unsuccessfully objected to the appointment of this particular psychologist because Dr. Lott was also evaluating Junior and Gillis.[6] At an August 11, 2000 hearing, it was disclosed that Dr. Lott's report, which found Byrom competent to stand trial, had been received by the defense and the trial judge. The trial judge held that the report would remain confidential, "until such time as [the trial judge] deemed it appropriate that the State be provided that information."

¶17.    On August 28, 2000, the trial court granted Byrom's request for another psychiatric expert "for the defense and mitigation phases of her trial." Byrom hired Dr. Keith Caruso to perform this evaluation. Dr. Caruso's conclusions were contrary to those of Dr. Lott. Dr. Caruso found, inter alia, that Byrom's medical problems and personality/social disorders substantially impaired her capacity to appreciate the criminality of her conduct and to conform her conduct to the requirements of the law, but not to the degree that she met the Mississippi standard for an insanity defense.

---

[6] *See* Issue III, *infra*, where this issue is discussed in detail.

¶18. The issue of disclosing Dr. Lott's report was again considered at a status conference conducted on September 5, 2000. Byrom argued she should not be required to disclose the contents of the report unless she planned to present psychiatric evidence at trial. However, the defense advised the State of their intention of introducing Dr. Caruso's report during sentencing, and the report was, in fact, introduced by the defense at the sentencing phase of the trial. Byrom also contended at the pretrial hearing, as she does here on appeal, that the State should not receive the reports of Drs. Lott and Caruso unless and until the sentencing phase of the trial commenced. Byrom argued that since certain factual revelations were made to Drs. Lott and Caruso the State should not be privy to the report.

¶19. After hearing arguments, the trial judge ordered Byrom to disclose the reports to the State. In his order, the trial judge considered the Uniform Rules of Circuit and County Court Practice (URCCC), and more specifically URCCC 9.07 [Insanity Defense], which states in pertinent part:

> No statement made by the accused in the course of any examination provided for by this rule shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. . . .

¶20. "This Court is limited in reversing a trial court's actions regarding discovery issues. We may reverse a trial judge's ruling regarding discovery issues only if we find an abuse of discretion." *Conley v. State*, 790 So.2d 773, 782 (Miss. 2001) (citing *Harkins v. Paschall*, 348 So.2d 1019, 1022 (Miss. 1977)).

¶21. URCCC 9.04 deals with, inter alia, reciprocal criminal discovery and provides, in pertinent part, as follows:

> C. If the defendant requests discovery under this rule, the defendant shall, *subject to constitutional limitations*, promptly disclose to the prosecutor and permit the prosecutor to inspect, copy, test, and photograph the following information and material which corresponds to that which the defendant sought and which is in the possession, custody, or control of the defendant or the defendant's attorney, or the existence of which is known, or by the exercise of due diligence may become known, to the defendant or

8

defendant's counsel:

> 1. Names and addresses of all witnesses in chief which the defendant may offer at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statements made by any such witness.
> 2. Any physical evidence and photographs which the defendant may offer in evidence;
> 3. Any reports, statements, or opinions of experts, which the defendant may offer in evidence.

******

> G.  Upon a showing of cause, the court may at any time order that specified disclosures be restricted or deferred, or make such other order as is appropriate, provided that all material and information to which a party is entitled *must be disclosed in time to permit the party's attorney to make beneficial use thereof.*

(emphasis added).

¶22.    Byrom filed a request for discovery on December 13, 1999.  Therefore, pursuant to URCCC 9.04(C), Byrom was required to "promptly disclose" Dr. Caruso's report, which the defense had informed the State they intended to introduce, and did in fact introduce, at trial.  The rule does not distinguish between the guilt/innocence or sentencing phases of the trial.  The only limitation in the rule is that these disclosures are to be made subject to constitutional limitations.

¶23.    Byrom cites as support for her argument *United States v. Beckford*, 962 F. Supp. 748 (E.D. Va. 1997), where the federal district court interpreted the Federal Rules of Criminal Procedure and allowed the sealing of psychiatric evaluations until the penalty phase of the trial, and *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), where a limiting order was issued by the trial court, requiring one prosecutor to prepare for the introduction of the psychiatric report at sentencing, and, simultaneously to keep the contents of the report secret from the rest of the prosecution team during the guilt phase. However, the *Allen* court agreed with our own Fifth Circuit, which has rejected the *Beckford*

9

interpretation of the federal rules. *See Allen*, 257 F. 3d at 773-74 (citing *United States v. Hall*, 152 F. 3d 381, 399 (5th Cir. 1998)). In *Hall*, the Fifth Circuit held:

> While we acknowledge that such a rule is doubtless beneficial to defendants and that it likely advances interests of judicial economy by avoiding litigation over whether particular pieces of evidence that the government seeks to admit prior to the defendant's offering psychiatric evidence were derived from the government psychiatric examination, we nonetheless conclude that *such a rule is not constitutionally mandated*. Our conclusion in this regard is bolstered by Rule 12.2(c) of the Federal Rules of Criminal Procedure, which provides that, when a defendant intends to rely upon an insanity defense during the guilt phase of his trial, the district court may order a mental examination upon motion by the government. *See* Fed.R.Crim.P. 12.2(c). In order to safeguard the defendant's privilege against self-incrimination, the rule provides as follows:

> > "No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced testimony."

> *Noticeably absent from the rule is any requirement that the government be denied access to the results of the examination until after the defendant actually introduces testimony regarding his mental condition.* Rather, the rule merely precludes the government from introducing as evidence the results of the examination or their fruits until after the defendant actually places his sanity in issue. Yet the rule has consistently been held to comport with the Fifth Amendment. *See, e.g., United States v. Lewis*, 53 F.3d 29, 35 n. 9 (4th Cir. 1995); *United States v. Stockwell*, 743 F.2d 123, 127 (2d Cir. 1984) ("[W]hile we do not wish to encourage the practice of requiring defendants to submit to a psychiatric examination in the prosecutor's presence (either in person or through the use of a tape recording), such a procedure cannot be said to constitute a per se violation of Rule 12.2(c) and the defendant's Fifth Amendment rights."). Given that the government presents its case-in-chief during the guilt phase prior to the defendant, we perceive no functional distinction between the risk that the government will improperly utilize the fruits of a psychiatric examination undertaken pursuant to Rule 12.2 during its case-in-chief (and thus prior to the defendant's offering psychiatric evidence of insanity) and the risk that the government in this case would improperly utilize the fruits of the court-ordered psychiatric examination prior to Hall's introduction of psychiatric evidence during the penalty phase. *We therefore reject Hall's contention that the district court violated his Fifth Amendment privilege against self- incrimination by ordering him to undergo a*

10

*psychiatric examination as a condition upon his offering psychiatric evidence during the sentencing hearing or by declining to order the results of the examination sealed until the sentencing hearing.*

**United States v. Hall**, 152 F.3d 381, 399-400 (5th Cir. 1998) (emphasis added).

¶24. We find no error in the decision of the trial judge in the case at bar to require disclosure of the reports prior to the sentencing phase. It is noteworthy that neither of the reports were used at the guilt phase of the trial. Therefore, any assertion that their disclosure compromised Byrom's constitutional privilege against self-incrimination is moot. Moreover, the trial court deferred disclosure of the reports until less than one month before the actual trial date and disclosed them then only because he was concerned about the State "being hamstrung" at the impending trial by not being able to intelligently meet this evidence when presented by the defense.

¶25. Next, Byrom asserts that "[t]he trial court should have at least made every effort to prevent the prosecutors handling that guilt/innocence phase from seeing the reports until a guilty verdict had been rendered." Although he did not require the State to divide its prosecutorial team and allow only the sentencing team to view the reports, the trial judge cautioned the State against using Byrom's statements against her during the guilt phase of the trial, and the State completely complied with these instructions. Therefore, we conclude that Byrom's constitutional rights were adequately safeguarded and protected and that this issue is without merit.

## II. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING THE DEFENDANT'S MOTION FOR CHANGE OF VENUE.

¶26. Byrom next contends that the trial court erred in not granting a change of venue. However, no motion for a change of venue appears in the record. There was mention of a possible motion for change of venue during pre-trial hearings, but the trial judge reserved ruling on that issue until closer to the time

11

when the case would be set for trial. There is no indication in the record that any such motion was ever presented to the judge. Byrom admits in her brief that her counsel erroneously believed the trial judge denied her motion for a change of venue. Byrom's counsel requested and was granted restrictions as to communications by jurors. Byrom fails to attempt to demonstrate that she was prejudiced by the denial of her "motion" for a change of venue, nor does she explain why a formal motion was never filed or adequately pursued.

¶27. "It is well-established in our jurisprudence that 'the granting of a change of venue' is a matter so largely in [the] discretion of the trial court that a judgment of conviction will not be reversed on appeal on the ground that a change of venue was refused, unless it clearly appears that [the] trial court abused its discretion." *Simon v. State*, 688 So.2d 791, 804 (Miss. 1997) (quoting *Billiot v. State*, 454 So.2d 445, 454 (Miss. 1984)). "This Court has repeatedly held that '[i]t is the responsibility of the movant to obtain a ruling from the court on motions . . . and failure to do so constitutes a waiver.'" *Evans v. State*, 725 So.2d 613, 707 (Miss. 1997) (citations omitted). *See also* URCCC 2.04. The trial judge did not err by failing to rule on a motion that was apparently never filed and was clearly never brought on for hearing.

¶28. Moreover, not only is the issue procedurally barred, but it also lacks merit. There is no evidence in the record, nor demonstrated by Byrom in her brief, that the failure to move her trial to another county was prejudicial to her case. A motion for a change of venue is not automatically granted in a capital case. There must be a satisfactory showing that a defendant cannot receive a fair and impartial trial in the county where the offense is charged. Miss. Code Ann. § 99-15-35 (Rev. 2000). *See also Gray v. State,* 728 So.2d 36, 65 (Miss. 1998). Moreover, the trial judge took steps, suggested and condoned by Byrom's counsel, to preserve the jury's impartiality. Therefore, this assignment of error is without merit.

### III. WHETHER THE TRIAL COURT ERRED IN REQUIRING THE DEFENDANT TO SUBMIT TO THE PSYCHIATRIC EXAMINATION OF DR. LOTT, IN SPITE OF THE WITHDRAWAL BY THE DEFENDANT OF HER REQUEST FOR A PSYCHIATRIC EXAMINATION.

¶29. Byrom next asserts as error the fact that the trial court ordered her, Junior, and Gillis to be evaluated by the same psychologist, Dr. Criss Lott. The trial judge stated that he had spoken to Dr. Lott and been advised that there would be no ethical or practical problem with keeping the evaluations separate and distinct. Based upon this information, the trial judge ordered that Dr. Lott determine each defendant's competence to stand trial.

¶30. Byrom argues that her concern that Dr. Lott might inadvertently mingle the information obtained from each of the defendants was justified and that separate psychologists should have been provided.[7] She alleges that a few months after she was sentenced, Dr. Lott divulged to Gillis's attorneys that Junior had confided in him that he had shot Byrom, Sr.[8] Beyond this allegation, Byrom fails to identify in the record where she was prejudiced by having Dr. Lott examine all of the defendants.

¶31. Byrom also argues that the examination should not have been conducted because it was done without her consent. She alleges that her motion for psychiatric evaluation was withdrawn when the judge ordered all of the defendants to be evaluated by Dr. Lott. For support, she argues she orally withdrew the motion and alleges that she also sent a letter to Dr. Lott, which she copied to the trial judge, informing Dr. Lott that the examination was conducted without her or her attorney's consent.[9] However, Byrom has not

---

[7]Initially, it should be noted that Dr. Lott did not testify and was not mentioned during the guilt phase of the trial. Therefore, Dr. Lott's appointment had no apparent affect on the guilty verdict in this case, and this argument is moot.

[8]This information is not part of the record.

[9]This letter is not a part of the record.

13

produced this letter, and the record does not reflect that Byrom's motion for a psychiatric evaluation was withdrawn at anytime prior to the examination. "Issues cannot be decided based on assertions from the briefs alone. The issues must be supported and proved by the record." *Pulphus v. State*, 782 So. 2d 1220, 1224 (Miss. 2001) (citing *Robinson* 662 So. 2d 1100, 1104 (Miss. 1995).

¶32.    In support of her position, Byrom cites only one case, *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), and merely states that "[t]he requirements of [*Ake*] were severely compromised with the procedure used by the trial court in this case."

¶33.    "In *Ake*, the United States Supreme Court ruled that a trial judge is required 'to allow expert psychiatric or psychological assistance to indigent defendants upon a threshold demonstration that sanity will be an issue or for the purpose of rebutting the State's experts regarding mental condition.'" *Woodward v. State*, 726 So. 2d 524, 529 (Miss. 1997) (quoting *Cole v. State*, 666 So. 2d 767, 781 (Miss. 1995)). *Ake* does not require that an indigent defendant be given funds to pay for the psychiatrist of his or her own choosing, even in cases where sanity is at issue. *See Jackson v. State*, 684 So. 2d 1213, 1221 (Miss. 1996). In any event, Byrom did, shortly after the evaluation by Dr. Lott, obtain permission and funds to be evaluated by the doctor of her choice, Dr. Caruso. This assignment of error is without merit.

## IV.    WHETHER THE TRIAL COURT ERRED IN REQUIRING THE DEFENDANT TO TURN OVER ALL OF HER MEDICAL RECORDS TO DR. LOTT.

¶34.    Although Byrom assigns this issue as error, she does not make any specific argument nor does she cite any relevant authority with regard to this claim. She does not present evidence that she did in fact turn

14

over all her records to Dr. Lott, nor does she point to an order from the trial court requiring her to do so or an objection made by her regarding same.

¶35. "Our law is clear that an appellant must present to us a record sufficient to show the occurrence of the error he asserts and also that the matter was properly presented to the trial court and timely preserved." *Acker v. State*, 797 So. 2d 966, 977 (Miss. 2001) (quoting *Lambert v. State*, 574 So. 2d 573, 577 (Miss. 1990)). *See also Pulphus v. State*, 782 So. 2d at 1224. "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001) (citing *Williams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998)). Consequently, this issue is not properly before the Court and is procedurally barred from our consideration.

¶36. Alternatively, this issue is without merit. Once a patient puts her health in issue at trial, she waives her physician-patient privilege. M.R.E. 503(f); *Holland v. State*, 705 So.2d 307, 334-35 (Miss. 1997). Byrom specifically requested that her mental health be evaluated by Dr. Lott. In order for Dr. Lott to fully evaluate Byrom, it is understandable that he would need to review all of her relevant medical records.

## V. WHETHER THE TRIAL COURT ERRED IN REFUSING TO PERMIT THE INTRODUCTION OF PORNOGRAPHY DURING THE GUILT/INNOCENCE OR SENTENCING PHASE OF THE TRIAL.

¶37. At trial, Byrom attempted to introduce evidence regarding Byrom, Sr.'s purported fixation with pornography and her alleged non-consensual participation in various sexual events. Byrom wished to present pornographic evidence to the jury in order (1) to explain why she discussed Byrom, Sr.'s death with other individuals; (2) to provide a possible motive as to why Junior may have independently killed Byrom, Sr. without any assistance from anyone or encouragement from her; and, (3) to explain why the

15

door to Byrom, Sr.'s pornographic viewing room would have been locked, thus supposedly preventing Gillis, but not Junior, from gaining access to Byrom, Sr.'s room and Byrom, Sr.

¶38.   After hearing considerable argument, the trial court ruled the pornographic tapes could not be played during either the guilt or sentencing phases of the trial.  Byrom asserts this exclusion as error.  She cites *Acklin v. State*, 722 So. 2d 1264 (Miss. Ct. App. 1998), for the proposition that relevant evidence takes many forms, however distasteful they may be. She argues that the pornographic evidence's relevance was so obvious as to the sentencing portion of the trial that the trial court's exclusion of it caused her counsel simply not to offer testimony, since it would make no sense if not demonstrated.

¶39.   According to Byrom, in addition to the commercial video entitled "Luna Chick" and the home video of her engaging in a sexual act, there should have been much more pornography found in Byrom, Sr.'s private room.  Byrom alleges that law enforcement intentionally altered the crime scene by either destroying the additional videos or by turning them over to the Byrom family who destroyed them.

¶40.   The matter of any missing videos was discussed at an August 11, 2000, pretrial hearing.  In response to the defense's inquiry, the Assistant District Attorney stated that approximately thirty videos were taken from the crime scene - not all of which were pornographic - and the defense was allowed to view them all and duplicate whichever they chose.

¶41.   The record is devoid of evidence that additional pornographic videos were found at the crime scene and removed by law enforcement. Additionally, Byrom has failed to demonstrate, and the record does not support her allegation, that law enforcement intentionally destroyed pornographic videos in violation of her due process rights.  This Court has held that:

> the following is required in order to find a due process violation by the State in a preservation of evidence case: (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of

16

such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*State v. McGrone*, 798 So. 2d 519, 523 (Miss. 2001). Byrom has failed to demonstrate that law enforcement was aware of the exculpatory potential, if any, of the alleged additional pornographic videotapes; Byrom was able to introduce, through other means, Byrom, Sr.'s obsession with pornography; and Byrom has not shown bad faith on the part of law enforcement. Therefore, because Byrom fails the three-part standard set out in *McGrone*, we conclude that Byrom's allegations with regard to the additional pornography are without merit.

¶42. Byrom sought to introduce the commercial videotape in order to demonstrate Byrom, Sr.'s obsession with pornography. However, this fact was adequately shown through other reliable means, such as the police photographs and videotape of Byrom, Sr.'s private room and the statements of officers contained therein. Thus, Byrom was not prejudiced by its exclusion. Introduction of this commercial tape would have been merely cumulative of this more sanitized evidence and would have served no additional, relevant purpose. Therefore, we conclude that the trial judge did not abuse his discretion in refusing to admit it.

¶43. Byrom argues an important aspect of her defense was that her actions were motivated by the abuse she suffered at the hands of Byrom, Sr. She has alleged that a large part of this abuse was sexual. Thus, she sought to introduce a home video depicting her being forced to engage in sexual acts. However, Byrom was given sufficient latitude to convey her theory of abuse to the jury. Like that of the commercial pornography, Byrom's theory of abuse was established through other evidence. The jury received evidence that Byrom, Sr. physically abused Byrom and Junior; that Byrom, Sr. forced Byrom to have sex with other people and foreign objects; that Byrom, Sr. was obsessed with pornography; and, that Junior,

17

not Gillis, supposedly killed Byrom, Sr. The jury did not need this home video to be convinced of Byrom, Sr.'s abusive and pornographic tendencies. We find the trial court did not commit error in excluding the home video of Byrom. Therefore, this issue is without merit.

## VI. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT BYROM'S AMENDED MOTION TO SUPPRESS AND TO COMPEL DISCOVERY.

¶44. Byrom was interviewed as a witness on the day of the murder. She waived her rights and gave her first statement, in which she did not incriminate herself. Subsequently, Byrom submitted to four audio-taped statements in which she did incriminate herself. Tishomingo County Sheriff David Smith questioned Byrom at 9:00 a.m. on June 6, 1999, and recorded the interview. Byrom argues this statement should have been suppressed because she was given a defective *Miranda* warning which did not apprise her of her right to have an attorney present during interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). According to the tape, the Sheriff advised Byrom:

> Before we ask you any questions, you must understand your rights. *You have the right to remain silent.* Anything you say can and will be used against you in a court of law. But if you cannot afford an attorney, one will be appointed for you. If you wish to answer questions at this time *you do have the right to stop at any time and to talk to an attorney before you ask any question - we ask you any more questions.* Do you understand your rights?

(emphasis added). Byrom indicated that she understood her rights. She was asked if she was willing to speak with the Sheriff again, and she replied, "Oh, yes." During this statement, Byrom stated, inter alia, that: (1) after she collected the insurance money she was going to pay Gillis; (2) she did not know whether Gillis was going to do the actual shooting or have someone else do it; (3) the first price she discussed with Gillis was $10,000, but then he wanted $15,000, which she agreed to pay; (4) she had tried to recruit another person to kill her husband prior to Gillis; and (5) she implicated Junior in the conspiracy, stating

18

that he was in on trying to find someone to kill his father and that he came to the hospital and told her that it was done.

¶45. Tishomingo County Sheriff's Deputy Donnie Edmondson testified that Byrom understood her rights and that she knowingly and intelligently waived those rights. Defense counsel argued that Deputy Edmundson did not know the *Miranda* rights, but counsel's attempt to have him recite the *Miranda* warnings was objected to by the State and disallowed by the trial judge.

¶46. According to Deputy Edmondson, Byrom did not appear inhibited in any way from understanding what was happening. Additionally, Sheriff Smith testified that Byrom's doctor, present during the interview, told him that the medications Byrom was on would not "alter anything she had to say."

¶47. The trial judge ruled that the *Miranda* warnings given were sufficient; therefore, the recorded statement was admitted and played for the jury. Specifically, the trial judge noted: "This court is of the opinion that while the language in it does not exactly track the classic *Miranda* warning, it does in fact fairly advise her . . . ." The trial judge further noted that Byrom had been given the classic *Miranda* warnings by MHP/CIB Investigator Marlar and a defective version of the warnings in the hours prior to giving the June 6, 1999, statement. He stated, "it's not as if she were operating in a total vacuum."

¶48. Byrom also gave a statement at the jail to the District Attorney's investigator Ralph Dance (Dance) and Deputies Rodney Pannell and Bobby Flynt on June 7, 1999. Dance testified that he read a waiver-of-rights form to Byrom. She asked, "At anytime I want I can bring in my attorney?" Dance replied, "That's your options. Yes ma'am, I am going to read this to you and that will explain it to you." Dance then read the waiver-of-rights form to Byrom again. Byrom signed it, indicating that she had been informed of her rights, that she understood her rights, and that she waived those rights. That portion of the tape was played for the judge at the suppression hearing.

19

¶49. After Dance read the form the second time, he asked Byrom if she was willing to talk, and she said, "Yes." Dance asked Byrom, "I know your rights have been read to you on several occasions, I'm sure, since all of this took place, is that correct?" Byrom indicated that they had been. According to Dance, Byrom "was competent and knew exactly what was going on."

¶50. During this statement, Byrom reiterated many of the things she divulged in her prior statements, including: (1) the two failed attempts by Gillis to kill her husband; (2) Junior coming to her hospital room and telling her that "it's done" and her telling Junior to go home and see if he's suffering and to get him help if he is; (3) Junior going home and calling 911, then calling Byrom to tell her the victim had been shot dead; (4) that she talked to another person about killing Byrom, Sr.; (5) that she first offered Gillis $10,000 for the murder, but they settled on $15,000; (6) that she would pay him out of the insurance proceeds; (7) that she planned on selling her house and moving to Florida to live with Gillis and Junior; and (8) that she thought the victim had $150,000 in life insurance benefits.

¶51. The trial court ruled that this statement would be admissible at trial. The trial judge noted that:

> [I]t cannot possibly be the law that you can never go back and take a valid statement if the defendant is properly advised and not operating under the coercion or promise of favor or threat or some such thing as that. If that is the law, we are certainly in trouble.

The taped statement and the transcript were admitted at trial. The defense stated that they had no objection to this.

¶52. A suppression hearing was held during which Byrom argued that she did not remember much about these interviews due to her medication. She testified that she did not know her rights; specifically, she argued that she did not know she had a right to have an attorney present during these interviews because of the defective nature of the *Miranda* warnings given.

20

¶53. The trial judge suppressed the second and third statements (given June 4, 1999, and June 5, 1999) and admitted the fourth and fifth statements (given June 6, 1999, and June 7, 1999); finding that the *Miranda* warnings given on June 4, 1999, were defective and that no warnings were given on June 5, 1999. Byrom argues that the remaining two recorded statements should also have been suppressed because they were not freely and voluntarily given as she was not sufficiently advised of her rights prior to giving them and because law enforcement acted deceptively during the interviews.

¶54. Byrom and Junior were allowed to pass mail to each other while they were incarcerated. The sheriff's office intercepted and copied virtually all the correspondence that was incriminating. Byrom claims that because her confessions were involuntarily given and in violation of her constitutional rights these letters are fruit of the poisonous tree and should have been suppressed. She argues that in the absence of these unlawful statements, the State would have had no right to incarcerate her and the letters would never have been written.

¶55. The burden that Byrom must satisfy in order to warrant this Court's reversal on these grounds was described in *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996), as follows:

> Once the trial judge has determined at a preliminary hearing that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal." *Sills v. State*, 634 so. 2d 124, 126 (Miss. 1994) (quoting *Frost v. State*, 483 So. 2d 1345, 1350 (Miss. 1986)). Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. *Foster v. State*, 639 So. 2d 1263, 1281 (Miss. 1994) (citations omitted). The trial judge's decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence. *Id.* Where the evidence is contradictory, this Court generally must affirm.

*Hunt*, 687 So. 2d at 1160.

## A.    The *Miranda* Warnings.

21

¶56. In support of her assertion that the trial judge erred in refusing to suppress her statements, Byrom initially argues that the trial court improperly placed the burden of proving the inadmissibility of the confession on Byrom. In support of this argument, Byrom cites to a point in the suppression hearing wherein the following exchange occurred:

> THE COURT: I will be happy to hear any comment you might have in support of your position that this is a defective *Miranda* warning and therefore inadmissible.
> MR. WOOD: Well, Your Honor, of course we maintain that the State has the position to prove beyond a reasonable doubt that any waiver and so forth done voluntarily and knowingly. But in light of the fact Your Honor has asked me to address it first . . .

¶57. Following Byrom's counsel's argument, the State presented its position regarding why the confessions were admissible. Thereafter, witnesses were called and examined by both parties, with the State presenting its witnesses first. Byrom makes no argument as to how this order of proof demonstrated that the trial judge improperly placed upon her the burden of proving the involuntariness of this confession. Nor does she offer any authority in support of her position. Byrom made no formal objection at trial to this order of argument. In light of her failure to do the foregoing, Byrom's contention that this was error is barred on appeal. Additionally, Byrom's counsel waived any alleged procedural error by proceeding with his argument. In any event, we conclude that this argument is without merit, as the trial judge was, in effect, merely asking the attorneys to present "opening statements" outlining their reasons for opposing or advocating admission of the confessions prior to hearing testimony.

¶58. Next, Byrom claims that the *Miranda* warning given to her prior to the June 6, 1999, statement were insufficient to advise her of her right to counsel. At the suppression hearing, Byrom argued that the *Miranda* warnings were defective, in that they did not advise her of her right to speak with counsel before questioning began and advised her only of her right to speak with an attorney after questioning had already

22

ensued. Byrom cites the case of ***Holifield v. State***, 275 So. 2d 851, 855 (Miss. 1973), wherein this Court held that "before interrogating a suspect in custody, the State or its representatives must tell the suspect of his right not to speak without counsel."

¶59.    The trial judge found as a matter of law from the totality of the circumstances that law enforcement's efforts to give Byrom her ***Miranda*** warnings did "in fact fairly advise her" even though the warnings did not "exactly track the classic ***Miranda*** warning." While as noted by the trial court, the warnings were not the "classic" warnings, Byrom was fairly advised of her rights. First of all, the warnings which Byrom claims to be deficient were commenced by Sheriff Smith informing Byrom that "[b]efore we ask you any questions, you *must* understand your rights. ***You have the right to remain silent*** . . . . If you wish to answer questions at this time you do have the right to stop at any time and to talk to an attorney before you ask any question -- we ask you any more questions." (Emphasis added). We have to look at what Sheriff Smith told Byrom in its totality and not in a vacuum. The first words out of the Sheriff's mouth let Byrom know that (1) before we ask you any questions you must understand (2) that you have the right to remain silent. Certainly Byrom could not have misunderstood her rights. Even if we were to somehow conclude that the ***Miranda*** warnings given on June 6, 1999, did not adequately inform Byrom of her right to speak with counsel prior to questioning or of her right to have an attorney present during questioning, we can safely conclude that any error committed in admitting this third statement would be harmless beyond a reasonable doubt. Prior to the taking of this third statement, Byrom had already been informed of some variation of her rights on two prior occasions. First, during her interview with MHP/CIB Investigator Marlar, it is undisputed that the warnings given were proper. Second, during the first interview with Sheriff Smith, the warnings given were somewhat deficient. As the trial judge stated, "[i]t's not as if she was operating in a vacuum." Most importantly, the June 6, 1999, statement was merely

23

cumulative of the June 7, 1999, statement in which Byrom was undisputedly given the proper *Miranda* warnings and waived them in writing. Byrom divulged essentially the same information in this interview that she did in the June 6, 1999, interview. This is not a situation where Byrom was unclear as to what her rights were. By June 6th, Byrom was hardly unfamiliar with *Miranda v. Arizona*. Rather, this is similar to *Holifield*, wherein this Court held:

> Appellant herein was advised of his rights prior to confession. There was substantial evidence to the effect that he, of his own volition, chose to and did intelligently waive his right to the presence and advice of counsel. His confession was upon the record properly admitted into evidence.

*Holifield*, 275 So. 2d at 855.

> ### *(1)   Effect of Prior, Unconstitutional Interrogations on the Admissibility of Statements Given after Byrom was Properly Advised of her Miranda Rights.*

¶60.    Byrom claims that the sheriff and his deputies, at a minimum, should have been required to advise her that her prior statements could not be used against her. She argues that Dance's comments (during her fourth statement) to the effect that she had already been advised of her rights and spoken with the sheriff's office was tantamount to implying that her rights were useless and that by this point her "free will was already broken down" by the coercion of the sheriff's office.

¶61.    The United States Supreme Court has addressed and dismissed a claim similar to the one urged by Byrom in the case at bar:

> Respondent, however, has argued that he was unable to give a fully informed waiver of his rights because he was unaware that his prior statement could not be used against him. Respondent suggests that Officer McAllister, to cure this deficiency, should have added an additional warning to those given him at the Sheriff's office. Such a requirement is neither practicable nor constitutionally necessary . . . We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements

obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

*Oregon v. Elstad*, 470 U.S. 298, 316-18, 105 S.Ct. 1285, 1296-98, 84 L. Ed. 2d 222 (1985).

¶62. This Court has held "that the fruit of the poisonous tree doctrine is defeated where the confession is judged admissible." *Yates v. State*, 467 So. 2d 884, 887 (Miss. 1984) (citing *Wiley v. State*, 449 So. 2d 756 (Miss. 1984); *Hall v. State*, 427 So. 2d 957, 958 (Miss. 1982), and specifically overruling a case where the first confession was given without *Miranda* and the second confession was deemed inadmissible). We conclude that Byrom has not proved that the admitted statements were obtained by exploiting the excluded statements. Rather, it is clear from the totality of the circumstances that Byrom was advised of her rights on numerous occasions and that she understood and knowingly waived those rights.

### (2)     The Jailhouse Letters as Fruit of the Poisonous Tree.

¶63. Next, Byrom argues that she would not have been incarcerated but for the taint of the excluded confessions. Following this premise, she argues that the jailhouse letters written between Junior and her should have been excluded because they would not have been written but for her illegal incarceration.[10]

¶64. The State argues that the sheriff's office had probable cause to arrest and hold Byrom irrespective of her suppressed confessions. The State also points out that Byrom had confessed four times before these letters were ever written. Although the jailhouse letters exchanged between Byrom and Junior do not contain dates, Byrom's last statement was given on June 7, 1999, three days after the murder. Byrom does not allege that the jailhouse letters were written prior to this confession and without definitive proof to the

---

[10]These letters contained, inter alia, statements describing Byrom's involvement in the conspiracy to murder her husband and were used against her at trial.

contrary, we assume that they were not. In her statement, Byrom confessed to her involvement in the murder. This confession gave the sheriff's office sufficient probable cause to arrest her for the murder of Byrom, Sr.

¶65. The test for probable cause in Mississippi is the totality of the circumstances. *Haddox v. State*, 636 So. 2d 1229, 1235 (Miss. 1994). In other words, probable cause is:

> a practical, nontechnical concept, based upon the conventional considerations of every day life on which reasonable and prudent men, not legal technicians, act. It arises when the facts and circumstances within an officer's knowledge, or of which he has reasonably trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.

*Conway v. State*, 397 So.2d 1095, 1098 (Miss. 1980) (quoting *Strode v. State*, 231 So. 2d 279 (Miss. 1970)). The "duty of a reviewing court is simply to ensure that ... a 'substantial basis for concluding' that probable cause existed" was evidenced. *Rooks v. State*, 529 So. 2d 546, 554 (Miss. 1988) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed. 2d 527, 548 (1983)).

¶66. There was ample evidence from this fourth confession to support her incarceration for this crime, and the jailhouse letters seized were not fruits derived solely from the poisonous tree of Byrom's unconstitutional interrogations.

## B. The Allegations of Threats and Deceitful Conduct.

¶67. Byrom next claims that Sheriff Smith threatened and deceived her during her interrogations. All but one of Byrom's assertions are based on statements that were excluded. Therefore, the State argues they are of no moment to this appeal and should not be considered. Byrom urges the Court to keep in mind that, although these statements were excluded, she obviously remained under the influence of the coercive remarks made during the interrogations.

¶68.    During the June 4, 1999, interview, excluded for deficient *Miranda* warnings, Sheriff Smith told Byrom, "don't leave [Junior] out there biting the big ole bullet." The following exchange also occurred:

DS:    There are stuff that you are leaving out here. [sic] Now I'm going to tell you. Once we get to the point where we have to go talk to the Judge and everything. All that's going to matter. He's going to ask me how did she cooperate?

MB:    Yes.

DS:    Well I gonna have to tell him that you had a memory lapse on some of "stuff," we had to pick it out of her. [sic] Now that Judge ain't going to like it. He'd rather you had just told me so I can just go out here and get this guy off the streets.

¶69.    In the June 6, 1999, statement, admitted at trial, Byrom contends that Sheriff Smith threatened her, in order to get her to help her son get out of trouble. He told her "[t]hat's why we need to know who the other guy is cause your son is biting a big old bullet here. So you need to come out and help your son out and tell us who else it was." Byrom did not name another person. At this point in the interview, Byrom had already confessed that she hired Gillis to kill her husband and that Junior was aware of this.

¶70.    Byrom cites *Abram v. State*, 606 So. 2d 1015, 1031 (Miss. 1996), where this Court held, "[w]e have repeatedly condemned the practice whereby law enforcement interrogators, or related third parties, convey to suspects the impression, however slight, that cooperation by the suspect might be of some benefit." *See also **Layne v. State***, 542 So. 2d 237 (Miss. 1989). Byrom, citing *Agee v. State*, 185 So. 2d 671 (Miss. 1966), argues that her testimony at the suppression hearing clearly rebutted the State's evidence so that the State should have been required to offer testimony of all of the officers present.

¶71.    However, the only allegations that Byrom has made regarding threats or promises of leniency were those made by Sheriff Smith. As mentioned, the Sheriff's comments regarding how the judge would view Byrom's cooperation were made during the interview that was excluded, as was the first "biting the big

27

bullet" analogy. Byrom argues that her remarks in the interview ruled admissible were influenced by these comments.

¶72. This argument is moot because the statements were excluded. The same *Oregon v. Elstad* analysis that defeated Byrom's claim that the officers should have informed her that her first statements could not be used against her is applicable here. The remedy for coercive interrogation practices is exclusion of the statements in which the coercion was present. It does not require the exclusion of all subsequent interrogations that are preceded by proper *Miranda* warnings and are not coercive. *Oregon v. Elstad*, 470 U.S. at 316-18, 105 S.Ct. at 1296-98. *But see Rollins v. State*, 300 So.2d 145, 146 (Miss. 1974).

¶73. Furthermore, no prejudice resulted from the Sheriff's comments. Byrom had confessed to her and Junior's involvement prior to the comments, so it cannot be said that they encouraged her to implicate herself or Junior. The Sheriff's comments appear to have been made in an attempt to get Byrom to reveal the identity of the other person, if any, who was with Gillis at the time of the murder; otherwise, it looked like Junior was with him. Since Byrom did not identify any other person who might have been with Gillis, this alleged coercion produced no result, and these statements, though perhaps improper, were harmless.

## C. The Allegations of Intentional Misconduct by Law Enforcement.

¶74. Byrom next claims that personnel from the Tishomingo County Sheriff's Office acted in a number of improper ways. As a result, Byrom asserts that the trial court should have excluded Byrom's statements and letters, and Junior's recorded statements, and should not have allowed the State to object to Byrom's characterization of the crime scene with regard to the large amount of pornography present.

¶75. Junior was first interviewed by the sheriff's office on June 4, 1999. Sheriff Smith stated in his report that during this interview Junior told deputies that Byrom hired someone to kill Byrom, Sr. Following this

28

interview, the Sheriff interrogated Byrom and used the information allegedly gleaned from Junior during the interrogation. Sometime thereafter, Junior was interrogated again. The Sheriff's report stated that all interviews were taped. However, the only tape/transcript of an interview with Junior that was provided to the defense (or used at trial) was Junior's June 7, 1999, statement.

### (1) *Argument regarding alleged discovery violation*

¶76. Byrom argues that Tishomingo County Sheriff Department personnel intentionally lost or destroyed the tapes of Junior's interviews because they failed to properly advise him of his *Miranda* rights. She argues that this intentional deceit warranted suppression of her statements because the Sheriff used the information obtained from Junior to extract a confession from her. She also argues that the failure to provide her counsel with Junior's statements in the best form possible warranted suppression of all information supposedly received from Junior's undisclosed statements.

¶77. The State points out that Sheriff Smith testified that, for some unknown reason, the tape recorder failed to record Junior's statement. In response to Byrom's counsel's trial request for the tape of Junior's initial interview, the State argued that it had already provided defense counsel a copy of every interview it possessed.

¶78. The trial judge reissued a prior order to the State to produce all statements and tapes of statements that were in their possession. He concluded, "I can require lots of things but one of them is not that they produce things they don't have. Now, I don't know what else I can do."

¶79. No error can be predicated on this ruling. The Sheriff testified that the tape of Junior's interview simply did not exist. The tape recorder malfunctioned, and the interview was not recorded. The defense was provided a copy of the Sheriff's report wherein he stated that Junior told him that Byrom hired someone to kill his father and that she probably knew who shot him. (See n. 10, *supra*). While a

recorded or even a transcribed version of Junior's interview with the Sheriff may have been preferable, it is clear from the record that neither was in existence.

>    *(2)      Argument regarding alleged error in limiting the examination of Sheriff Smith*

¶80.    Byrom argues that the trial judge erred by refusing to permit her counsel to question Sheriff Smith during the suppression hearing regarding the content of Junior's missing statements. The record reveals that, during Byrom's counsel's examination of him, the Sheriff testified that Junior "basically . . . . told [deputies] all [they] needed to know when [they] . . . . talked to him [during the initial interview]."[11] Byrom's counsel thereafter asked the Sheriff to tell him everything that Junior told him during this initial interview; particularly whether there was anything else, other than what he included in his report, that he learned in the initial interview with Junior before going to talk with Byrom. The State objected, arguing that everything Junior told the Sheriff was in his report, which the defense possessed, and that defense counsel's questions were exceeding the scope of the suppression hearing by asking the Sheriff to testify as to the contents of the conversation. Byrom responded by pointing out that the motion was not only to suppress, but also to compel discovery and this line of questioning was relevant to discovery matters. The trial judge sustained the State's objection.

¶81.    Rule 611 of the Mississippi Rules of Evidence pertaining to witnesses allows the court "reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." As the Court of Appeals

---

[11]The Sheriff's report, in pertinent part, states: "[a]fter a short while he told me that his mother had hired someone to kill his father, he told me that he did not know who shot his father, but that his mother probably knew who did."

has correctly held, a trial court's rulings on the extent of cross-examination will be reversed only when an abuse of discretion is shown. *Fields v. State*, 758 So.2d 440, 441 (¶ 7) (Miss. Ct. App. 1999). Finding the trial court did not abuse its discretion in limiting the cross-examination of Sheriff Smith, this issue is without merit.

### (3) Argument regarding Gillis's identity

¶82.    Byrom also contends that because the first interview with Junior was not provided to the defense, then the information regarding the identity of Gillis may not have come from Junior (as the State claims) and may have first come from Byrom during the Sheriff's initial interview of her, which was suppressed. She argues that this information, being unlawfully obtained, was "fruit of the poisonous tree" and using it on Junior to get him to confess later is also part of the "fruit" and his confessions should have been suppressed as to Byrom.

¶83.    The standard of reviewing the admission of a confession is well-settled. "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Hunt v. State*, 687 So. 2d 1154, 1159 (Miss. 1996). The trial judge did not abuse his discretion in admitting the statement Investigator Dance took from Byrom. Furthermore, Byrom repeatedly detailed her involvement in hiring Gillis in her subsequent statements which were obtained after she gave separate and adequate consent. Therefore, this issue is without merit.

> **VII.    WHETHER THE TRIAL COURT ERRED IN REFUSING TO REOPEN THE SUPPRESSION HEARING ON MOTION OF THE DEFENDANT TO TAKE THE TESTIMONY OF EDWARD BYROM, JR., AND IN HAVING EX PARTE COMMUNICATIONS WITH THE ATTORNEY FOR EDWARD BYROM, JR.**

¶84. Byrom next claims error in the trial judge's refusal to reopen the suppression hearing to allow her the opportunity to call Junior to the stand to testify about the conditions of his interviews with law enforcement. Byrom cites no authority in support of this argument. Therefore, this issue is procedurally barred. "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001) (citing *Willams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998)). Procedural bar notwithstanding, this assignment is without merit.

¶85. Byrom claims it became apparent during defense counsel's interview with Junior that Sheriff Smith had not obtained any information about the alleged conspiracy through his conversation with Junior and that this information was learned only through the unlawfully obtained confession of Byrom. She also points to the report of Deputy Pannell wherein he stated that Junior did not give incriminating statements until confronted with Byrom's unlawful confessions. She alleges that Junior confirmed this and that his counsel had agreed to permit him to testify at the motion hearing on this limited issue; however, after ex parte communications with the judge, Junior's counsel changed his mind. Byrom asserts that Junior's counsel informed her attorney that he left because the trial judge told him that he was not going to permit Junior to testify. She argues that the State did not want Junior to testify and that this was accomplished.

¶86. Although he refused to reopen the hearing and force Junior to testify, the trial judge did allow defense counsel to proffer Junior's expected testimony. After hearing the proffer, the trial court ruled:

> The defendant Michelle Byrom is in no position to make any objection on the basis of any circumstances resulting in statements or for that matter any misstatement made by law enforcement to her concerning what his statement might have been, his complete confession or lack of confession or whatever. For that reason it is irrelevant.

¶87. Byrom's claim that Junior did not incriminate her before Sheriff Smith's illegal interrogation is not supported by the record. During that interview, the Sheriff told Byrom that he had talked to Junior and that

Junior had told him "everything." He told her that Junior said that he and Byrom were tired of being beaten by Byrom, Sr. and that Byrom told Junior to "go ahead and find somebody and send them to [Byrom] - that way it would keep [Junior] from being involved and [Junior] did send somebody to [Byrom]. He sent two or three people. [Junior] didn't know which person Byrom had got."

¶88.    There is simply no way that Sheriff Smith could have been privy to this information had Junior not told him. Gillis was in custody, but had so far denied any knowledge of a conspiracy to kill Byrom, Sr. In the only interview with Byrom prior to this one, Byrom revealed no incriminating evidence. Thus, despite Byrom's unsubstantiated allegations that Junior informed her counsel that he did not provide this information, the record reflects that he must have in fact done so.

¶89.    This Court has recognized that "a criminal defendant must be allowed to call witnesses to the stand even though those witnesses intend to invoke their privileges against self-incrimination as secured by the Fifth Amendment." *Williamson v. State*, 512 So.2d 868, 872 (Miss. 1987). *Accord*, *Saunders v. State*, 733 So.2d 325, 331-32 (Miss. Ct. App. 1998). Despite this precedent, no error can be predicated on the refusal of the trial court to reopen the hearing and force Junior to testify. Both *Williamson* and *Saunders* dealt with the defendant's right to confront the witnesses against him and the adverse inferences that were generated by the witnesses being called to the stand, having their statements read to them, and being allowed to simply take the Fifth Amendment after each question.

¶90.    In the case at bar, the refusal to allow Junior to testify occurred during a suppression hearing so the jury had not yet been empaneled. Junior did testify during the trial, and Byrom does not claim that her cross-examination of him regarding his initial statements to the Sheriff was restricted in any way. Thus, the possibility of adverse inferences present in both *Williamson* and *Saunders* was not a factor here. Nor

was Byrom's right to confront the witnesses against her impeded in any way, as she was allowed to cross-examine Junior during the trial.

¶91.    Byrom's failure to cite any authority in support of this argument bars the necessity of this Court's consideration of it. Alternatively, this issue is without merit, as the record does not support it. Byrom was allowed to make a proffer to the trial judge which outlined her reasons for wanting to call Junior. Thus, the information she hoped to get from Junior's testimony was before the trial court.

## VIII.    WHETHER THE TRIAL COURT ERRED IN REFUSING TO QUASH THE INDICTMENT.

¶92.    After the jury was empaneled and before testimony began, the defense filed a motion to quash the indictment. The trial court heard considerable argument regarding the indictment, found that it tracked the language of the statute, and ultimately denied the motion to quash.

¶93.    Byrom cites this failure to quash as error, claiming the indictment was defective because: (1) it failed to identify co-conspirators; (2) it offered several legal theories instead of setting forth a plain, concise, and definite written statement of the essential facts constituting the offense; (3) it contained the language "participated in any way"; (4) the statute defines parties to the offense as those individuals receiving an offer or receiving something of value and Byrom claims that she was not a party to the offense, based on the evidence adduced; and, (5) it sets forth the June 4, 1999, date of the murder, thus, Byrom claims any other evidence from any other date should have been excluded. The State submits that the indictment met all the requirements of the rules and statutes and fairly apprised Byrom of the charge against her. This Court agrees.

¶94.    The indictment at issue reads in pertinent part:

That MICHELLE BYROM in said County and State on the 4th day of June, A.D., 1999, did wilfully, unlawfully, and feloniously kill or cause the death of Edward Louis Byrom, a

34

human being, with deliberate design and without authority of law, after having been offered or having received something of value for committing the murder or was a party to such offer or receipt of anything of value or participated in any way in the murder of Edward Louis Byrom, in violation of Mississippi Code, Annotated, Section 97-3-19 (2) (d). . . .

Miss. Code Ann. § 97-3-19 (Rev. 2000) provides, in pertinent part:

(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

(d) Murder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals.

¶95.    The standard of reviewing the sufficiency of indictments is well settled:

The indictment must be a plain, concise and definite written statement of the essential facts constituting the offense charged and *shall fully notify the defendant of the nature and cause of the accusation against him. Peterson v. State*, 671 So. 2d 647, 653-54 (Miss. 1996); URCCC 7.06. The indictment is held to be sufficient if it contains the seven factors enumerated in URCCC 7.06.
    1. The name of the accused;
    2. The date on which the indictment was filed in court;
    3. A statement that the prosecution is brought in the name and by the authority of the State of Mississippi;
    4. The county and judicial district in which the indictment is brought;
    5. The date and, if applicable, the time at which the offense was alleged to have been committed. Failure to state the correct date shall not render the indictment insufficient;
    6. The signature of the foreman of the grand jury issuing it; and
    7. The words "against the peace and dignity of the state."

*Gray v. State,* 728 So.2d 36, 70 (Miss. 1998) (emphasis added).

¶96.    Though it concedes that substantive challenges to the sufficiency of the indictment are not waivable

and may be raised for the first time on appeal, *State v. Berryhill*, 703 So. 2d 250, 253 (Miss. 1997),

the State argues that Byrom's claims numbered (4) and (5) relate to evidentiary matters, and not the

35

sufficiency of the indictment.[12]  We agree.  These evidentiary claims were not presented to the trial court for consideration.  Thus, they are procedurally barred from consideration on appeal.  *See Evans v. State*, 725 So. 2d 613, 632 (Miss. 1997) (issues not presented to trial judge are "procedurally barred and error, if any is waived.  This rule is not diminished in a capital case."). Furthermore, Byrom fails to offer any authority in support of these claims, nor does she elaborate upon them with meaningful argument.  This "[f]ailure to cite relevant authority obviates the appellate court's obligation to review such issues." *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001) (citing *Williams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998)).

¶97.    Additionally, claim number (1), Byrom's contention that the indictment did not identify the co-conspirators, was specifically waived and disavowed by Byrom at trial.

| THE COURT: | Specifically, Counsel, I guess you would point to the fact that there are no allegations as to who received what. |
|---|---|
| DEFENSE COUNSEL: | **No, your Honor, I'm not complaining about that** . . . . According to that indictment [the Assistant District Attorney] could be about to prove that she was offered money to get in the scheme to kill Mr. Byrom. We're entitled to know one or the other what it is that they're wanting to prove by looking at the indictment. **We don't need a lot of facts.** |

(emphasis added).  Based upon this exchange, the State argues that this matter is waived on appeal. We agree. *See Gray v. State*, 728 So. 2d at 70-71 (distinguishing *Berryhill* and upholding procedural bar

---

[12]As set out, *supra*, claim (4) states that the statute defines parties to the offense as those individuals receiving an offer or receiving something of value and Byrom claims that she was not a party to the offense, based on the evidence adduced; and, claim (5) states that since the indictment alleges June 4, 1999, to be the date of the murder, any evidence of the murder relating to facts occurring on a date other than June 4, 1999, should have been excluded.

as to sufficiency of indictment when specific claim on appeal was not one of the six presented at trial on the motion to quash).[13]

¶98.    Alternatively, Byrom's claim as to this issue is without merit. Byrom asserts that murder-for-hire is, in essence, a conspiracy crime. Thus, she argues, the conspirators must be named in the indictment. Byrom cites no case that holds that an indictment must contain the names of the co-conspirators. She does cite *Stewart v. State*, 662 So. 2d 552 (Miss. 1995), a double jeopardy case which held that a person cannot be *convicted* of conspiracy to commit capital murder and of capital murder-for-hire for the same murder. However, the double jeopardy concerns discussed in *Stewart* offer Byrom no support, as she was indicted and convicted for one crime, capital murder.

¶99.    Byrom also cites *Farris v. State*, 764 So. 2d 411 (Miss. 2000), where this Court held a conspiracy indictment to be sufficient where the time period of the conspiracy was stated, four of the alleged co-conspirators were named, and the offense was clearly described. Byrom asserts that the standard of *Farris* was not met because the only time period stated is June 4, 1999; no co-conspirators, known or unknown, were named; and the offense description was confusing. However, *Farris* did not purport to establish a standard for what must be included in conspiracy indictments. Indeed, in *Farris*, the Court stated:

> So long as a fair reading of the indictment, taken as a whole, clearly describes the nature and cause of the charge against the accused, the indictment is legally sufficient. *Harrison v. State*, 722 So.2d 681, 686 (Miss. 1998) (citing *Henderson v. State*, 445 So.2d 1364, 1368 (Miss. 1984)) . . . . The indictment tracked the language of Miss. Code Ann. § 97-1-1 (1994), and sufficiently notified Farris of the charge against him, thus enabling him to prepare a defense.

---

[13] Additionally, Byrom's counsel conceded at trial that, "certainly, I agree that the State of Mississippi did not have to name any of the other conspirators - - or they didn't have to indict everyone in this indictment."

37

*Farris v. State*, 764 So. 2d at 421.

¶100.   In *Stevens v. State*, 808 So. 2d 908 (Miss. 2002), the accused, charged with manslaughter, cited *Umphress v. State*, 295 So. 2d 735 (Miss. 1974), in support of his argument that the indictment should have been quashed because it failed to name the "others" mentioned in the indictment who were allegedly involved in the crime with him.  The indictment in *Umphress* charged the defendant with delivering a controlled substance, but it did not designate the person to whom delivery of the substance was made, nor did it specify the time or place of the crime.  *Id.* at 736.  This Court held that the indictment was insufficient to place the defendant on notice of the charges against him.  *Id.*  However, in *Stevens,* we explained:

> Unlike the indictment in *Umphress*, the indictment in the case sub judice states the date and place of the alleged crime and specifically names both victims. The indictment clearly states the charge and gives sufficient descriptive facts to put Stevens on notice of the accusation against him. Noteworthy is the fact that all seven requirements of URCC[C] 7.06 are met by the indictment, and it reasonably provides Steven with actual notice of the charge against him, to wit: manslaughter pursuant to § 97-3-27. *See **Holloman v. State***, 656 So.2d 1134, 1139 (Miss. 1995) (stating that an indictment is sufficient if it meets these requirements). Though an indictment must sufficiently apprise a defendant of what he must be prepared to meet, this Court has never stated the indictment must specifically set out the proof necessary for a conviction. Furthermore, the record indicates that Stevens was well apprised of the identification of the "others," particularly in light of the fact that they were initially indicted and tried together.

*Stevens*, 808 So.2d at 919. This argument continues to be persuasive. All seven requirements of URCCC 7.06 are met by the present indictment, and it reasonably provided Byrom with actual notice of the charge against her.

¶101.   Finally, Byrom claims that the indictment did not adequately inform her of her alleged role in the murder-for-hire scheme.  Specifically, she claims that the "participated in any way" language in the indictment does not mirror the "all parties to such a murder" language in the statute.  However, defense counsel conceded at trial: "I would agree that it recites the Statute 97-3-19(2)(d)."  Moreover, as noted,

the trial court found that the language of the indictment tracked that of the statute. This Court has held that, "[a]s a general rule, where an indictment tracks the language of a criminal statute it is sufficient to inform the accused of the charge against him." *Stevens v. State*, 808 So. 2d at 918. In addition, the trial court noted when preparing the instructions, the "participated in any way" language in the indictment is mere surplusage.

¶102. This Court has made it "clear that the ultimate test, when considering the validity of an indictment on appeal, is whether the defendant was prejudiced in the preparation of his defense." *Medina v. State*, 688 So. 2d 727, 730 (Miss. 1996). Byrom has failed to prove, or even allege, that she was prejudiced, hampered, or disadvantaged in any way in preparing her defense to meet this indictment. While a defendant in a criminal case is without question entitled to sufficient notice of the charges by way of the language of the indictment and is certainly not required to rely on post-indictment discovery as a supplemental means of gaining adequate information to fairly meet the indicted charge, we acknowledge that the trial judge noted the discovery given to Byrom made clear the facts the State would be trying to prove with regard to her role in the crime and the identity of her co-conspirators. Again, we can alternatively state with firm resolve that, if any error does exist by way of improper language in this indictment, it is harmless beyond a reasonable doubt. Thus, this assignment of error is without merit.

## IX. WHETHER THE COURT ERRED IN PROHIBITING THE IMPEACHMENT OF EDWARD BYROM, JR.

¶103. Byrom next asserts error in the trial court's exclusion of the jailhouse letters written by Junior to Byrom. In these letters, which were not intercepted by the sheriff's office, Junior writes that he personally killed Byrom, Sr. with no help from Gillis and for his own personal reasons. These statements are inconsistent with Junior's trial testimony where he alleged that Gillis murdered his father at his mother's

bidding.  Byrom's counsel sought, on cross-examination, to impeach Junior's trial testimony through the introduction of these letters.  The State objected, and the trial judge excluded the letters because their existence had not been disclosed to the State.  Byrom asserts that this ruling was erroneous.

¶104.   The following reciprocal discovery rule applied to Byrom:

> C. If the defendant requests discovery under this rule, the defendant shall, subject to constitutional limitations, promptly disclose to the prosecutor and permit the prosecutor to inspect, copy, test, and photograph the following information and material which corresponds to that which the defendant sought and which is in the possession, custody, or control of the defendant or the defendant's attorney, or the existence of which is known, or by the exercise of due diligence may become known, to the defendant or defendant's counsel:
>
> > 1. Names and addresses of all witnesses **in chief** which the defendant may offer at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statements made by any such witness.

URCCC 9.04(C)(1) (emphasis added).

¶105.   Byrom's argument for the introduction of these letters, and her excuse for the fact that they were not disclosed, is that they were to be offered for impeachment purposes only and not as substantive evidence in her case-in-chief.  She argues that because she had no intention of calling Junior as a witness she did not have to provide the State with these letters. Byrom also cites *Jones v. State*, 710 So. 2d 870 (Miss. 1998), where this Court discussed Rule 613(a) of the Mississippi Rules of Evidence.[14]

¶106.   In *Jones*, the pertinent issue was whether the State had committed a discovery violation by failing to provide the defense a copy of a prior statement of a witness used to impeach him at trial.  This Court, finding no discovery violation, pointed out that M.R.E. 613 is not concerned with discovery. This Court

---

[14]"In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel." M.R.E. 613(a).

40

also noted that the comment to the rule states, "The provision allowing disclosure to counsel is designed to protect against unwarranted insinuations that a statement has been made when the fact is to the contrary." M.R.E. 613 cmt.

¶107.  The State argues that the issue is not that Junior made contradictory statements, but rather that he made contradictory statements that supported the defense's theory of the case (i.e., that Junior alone was responsible for the murder).  The State contends that a similar attempt to subvert the reciprocal discovery rules was addressed and condemned in *Coates v. State*, 495 So. 2d 464 (Miss. 1986).

¶108.  In *Coates*, the defendant was indicted for sexual battery of his minor stepdaughter.  On cross-examination, the defense sought to impeach the victim by introducing letters she wrote to the defendant which bore on the issue of consent.  The trial court excluded the letters and prohibited cross-examination of the victim regarding them.

¶109.  Recognizing the "prosecution's legitimate interest in a fair trial," this Court refused to reverse the exclusion of the letters because the letters were not disclosed to the State.  Because the letters in question "outlined the Defendant's substantive theory of the case," this Court held that, pursuant to the then-existing uniform circuit court rule 4.06[15] and the discouragement of "trial by ambush," the circuit court had the authority to exclude the letters. "In recent decisions we have been loathe to allow the prosecution to circumvent our discovery rules by pleas that the evidence was used for impeachment purposes. A similar policy is appropriate for defense discovery violations." *Coates,* 495 So. 2d at 466 (citing *Johnson v. State*, 491 So.2d 834, 836-37 (Miss. 1986); *Tolbert v. State*, 441 So.2d 1374, 1375 (Miss. 1983)).

---

[15]The corresponding rule in the current rules is URCCC 9.04.

¶110. Byrom argues that *Coates* is distinguishable from the case at bar. She points out that the witness in *Coates* was also the minor victim and was not the subject of a plea bargain, nor did the letters in that case admit that the witness had committed the crime for which the defendant was accused, as they do in the case sub judice. She urges the Court to consider that Junior was not a victim, but rather a co-conspirator in this murder who told more than one version of the events. She argues that the physical evidence suggested that Junior was the person who killed Byrom, Sr., and she asks the Court to remember that, after her trial, it became known that Junior had confided in Dr. Lott that he shot Byrom, Sr.

¶111. Despite the factual differences demonstrated by Byrom, the *Coates* rationale remains directly on point. It held that the defense must produce that evidence it intends to use substantively at trial. Byrom's theory was that Junior killed his father on his own, without encouragement from his mother or assistance from Gillis. Included in the letters were statements by Junior that he had done just that. Based upon the *Coates* decision, these letters were substantive evidence and should therefore have been disclosed to the State.

¶112. Byrom cites *Glaskox v. State*, 659 So. 2d 591 (Miss. 1995), where this Court upheld a sanction similar to the one in the case at bar when impeaching evidence in the possession of a defendant was not disclosed during discovery. Byrom points out that *Glaskox* noted that the defendant desired to use the evidence in his case-in-chief rather than on cross-examination. Specifically, this Court stated, "Glaskox failed to cross-examine D.G. on this issue during cross-examination in the State's case-in-chief, but rather called her adversely in his case." *Id*. at 594. Byrom argues that this statement illustrates that it would have been acceptable and not a discovery violation had Glaskox so cross-examined the witness and impeached her during the State's case-in-chief rather than attempting to do so in his own case-in-chief.

42

¶113. Though creative, this argument places too much emphasis on *Glaskox's* fact-specific rationale. It is true that part of the *Glaskox* opinion focused on the timing of the defendant's attempt to introduce undisclosed information, concluding that it represented a "deliberate scheme to gain a substantial tactical advantage." *Id.* at 594. However, it did so based upon the specific facts of that case. The facts before the Court in the case sub judice are unlike those presented in *Glaskox*, where the defendant sought to use the evidence in rebuttal. These facts are more akin to *Coates*, which, as described above, supports the exclusion of this evidence. Moreover, *Glaskox* upheld the exclusion of the undisclosed evidence, finding that "[t]his is exactly the type of tactics which the discovery rule was specifically created to prevent." *Id.* at 593.

¶114. It is important to pause and reflect on where we have been and where we are in this State concerning criminal discovery. Regarding the procedure to be followed by the trial judges when confronted with discovery violations by the prosecution during the course of the trial, Justice Robertson, in a concurring opinion, presented suggested guidelines. *Box v. State*, 437 So.2d 19, 23-26 (Miss. 1983) (Robertson, J., concurring). Five years later, this Court, having by that time adopted the suggested guidelines in the *Box* concurring opinion, stated that the trial courts were to follow the same procedure when there was a discovery violation by the defendant. *Darghty v. State*, 530 So.2d 27, 32-33 (Miss. 1988). The days of trial by ambush are over in the Mississippi trial courts, whether it be an ambush by the prosecution or by the defendant. *See, e.g., Johnston v. State*, 730 So.2d 534, 535-36 (Miss. 1997); *Frierson v. State*, 606 So.2d 604, 607 (Miss. 1992). *See also Booker v. State*, 745 So.2d 850, 852-53 (Miss. Ct. App. 1998). Yet, this is exactly what Byrom's defense attorney attempted to do - ambush the State. Byrom's attorney admitted that these two letters were intentionally withheld from the prosecution during

the discovery process because of defense counsel's intention to "impeach the daylights" out of Junior because "[t]hat's my job."

¶115. The *Box* guidelines has now been codified in URCCC 9.04(I), which reads, in pertinent part, as follows:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
> 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
> 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and *seeks a continuance or mistrial*, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
> 3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence. *The court shall follow the same procedure for violation of discovery by the defense.*

URCCC 9.04 (emphasis added).

¶116. Byrom sought to introduce the letters during trial. Therefore, according to Rule 9.04, the trial court was required to follow the *Box* procedure. After Byrom sought to introduce the letters, the court recessed until the next morning. During the interim, the trial judge allowed the State, over Byrom's objection, to discuss the contents of the letters with Junior. Thus, the State was given a chance to prepare to meet this evidence and arguably allowed to remedy the effects of any prejudice that would have resulted from its introduction.

¶117. When trial resumed, the State argued that had it known these letters existed, it might not have made a deal with Junior and probably would not have put him on the stand. In essence, the State argued that introducing the letters would unfairly prejudice the prosecution and cause a miscarriage of justice. However, the State did not request a mistrial or a continuance as mandated by Rule 9.04; rather, it stated: "[i]n this

44

case, of course, we want to go forward with it." The State cited *De La Beckwith v. State*, 707 So. 2d 547 (Miss. 1997), wherein this Court held that if:

> the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, 'it would be entirely appropriate to exclude the witness' testimony . . . [a]lthough a continuance admittedly would have allowed the prosecution to retrieve [another witness] we find that regardless of whether prejudice to the prosecution could have been avoided in this particular case, it is plain that the case fits into the category of willful misconduct in which the severest sanction is appropriate.

*Id.* at 575 (quoting *Taylor v. Illinois*, 484 U.S. 400, 413-15, 108 S.Ct. 646, 655, 98 L.Ed.2d 798, 814 (1988)). The State argued the failure to produce the letters was a deliberate attempt to gain a tactical advantage in violation of the discovery rules. It pointed to Byrom's counsel's statement that "[w]e have withheld this evidence purposely with the intent to use it to the fullest advantage of [our] client."

¶118. We conclude that the failure to disclose in the case at bar did warrant complete exclusion of the letters. Byrom was not prejudiced by the exclusion of these letters. Byrom's counsel was allowed to ask Junior if he remembered writing every statement in the letters and if he admitted writing letters to his mother in which he told her that there was no conspiracy and that he alone killed his father. Specifically, Junior admitted having previously stated that, once arrested, he gave the authorities "one bulls[expletive omitted]t story after another . . . to save [his] own ass." Junior also admitted having said that he was so scared, confused, and high that he just said the first thing that came out of his mouth. He further admitted having said that there was no conspiracy; that the crime had nothing to do with money; and, that it was just Junior, who had gotten mad at his father and killed him. Though he denied making some of the statements, the ultimate fact that Byrom sought to prove through their introduction, that Junior wrote his mother that he personally killed his father, was admitted by Junior in open court. Thus, the excluded evidence was before the jury. Therefore, this issue is without merit.

45

**X.  WHETHER THE TRIAL COURT ERRED IN PERMITTING THE
JURY TO HEAR THE TESTIMONY THAT JOEY GILLIS WAS IN
JAIL CHARGED WITH CAPITAL MURDER IN THE DEATH OF
EDWARD BYROM, SR., AND FURTHER ERRED IN
PERMITTING THE STATE TO ARGUE THIS IN CLOSING
ARGUMENT.**

¶119.  Byrom next asserts that she was prejudiced by the following exchange during the State's direct

examination of the District Attorney's Investigator, Ralph Dance:

> Q:  One more question, Mr. Dance.  What is the status of the investigation of Joey
> Gillis?
>
> A:  He's in jail awaiting trial.
>
> MR. [ASSISTANT DISTRICT ATTORNEY] POUNDS: We have no
> further questions, your Honor.
>
> THE COURT: Cross-examination?
>
> MR. [DEFENSE COUNSEL] WOODS: I have no questions of this
> witness.

¶120.  Byrom did not object to this question or answer at trial.  During closing arguments, after making

references to Gillis and his alleged involvement, the Assistant District Attorney made the following

statement: "And as Mr. Ralph Dance testified, Mr. Gillis is in jail awaiting trial.  That was his testimony."

After the prosecutor's closing arguments were concluded and the jury was excused, Byrom objected to

the reference to Gillis.  This objection was overruled.

¶121.  Byrom failed to make a contemporaneous objection to either of these statements.  Therefore, our

consideration of this issue is procedurally barred.  *See **Williams v. State***, 664 So. 2d 1179, 1203 (Miss.

1996) ("In death penalty cases, the contemporaneous objection rule is applicable.").  *See also* M.R.E.

103 (a) (1) (requiring timely, on-the-record objection before error can be predicated on the admission of

evidence).  However, plain error will allow an appellate court to address an issue not raised at trial if the

46

record shows that error did occur and the substantive rights of the accused were violated. *Grubb v. State*, 584 So.2d 786, 789 (Miss. 1991). Violations of fundamental rights are also subject to plain error review. *Porter v. State*, 732 So.2d 899, 902-05 (Miss. 1999). Thus, procedural bar notwithstanding, we will discuss the merits of this issue.

¶122. Byrom argues that Gillis's incarceration was irrelevant because the State sought only to introduce it as an attempt to prove her guilty by association. In support of her argument, Byrom cites two cases forbidding the admission of the co-defendant's conviction for the same offense, *Henderson v. State*, 403 So. 2d 139 (Miss. 1981) and *McCray v. State*, 293 So. 2d 807, 808 (Miss. 1974). However, these cases are distinguishable because Dance's testimony made clear that Gillis had not been convicted, but, rather, was awaiting trial. Thus, as the State argues, Byrom has failed to cite any persuasive and/or applicable authority on this issue. "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Simmons v. State*, 805 So. 2d at 487 (citing *Williams v. State*, 708 So. 2d at 1362-63).

¶123. "The question for this Court is whether the prosecutor's remarks denied the defendant a fundamentally fair trial. The prosecutor's remarks are viewed in light of the entire trial." *Lockett v. State*, 517 So. 2d 1317, 1333 (Miss. 1987) (citations omitted). "It is imperative that the statements be read in their appropriate context in light of that which the prosecutor was in fact arguing to the jury at the time." *Holland v. State*, 705 So. 2d 307, 347 (Miss. 1997).

¶124. The point the prosecutor was making was that Byrom hired Gillis to murder her husband. Gillis's guilt, and Byrom's resultant guilt, was not the inference that the prosecutor sought to achieve through these comments. The prosecutor's comment, when taken in context, is not subject to the interpretation offered

by Byrom. In fact, the trial judge, who observed the prosecutor as the comments were being made, came to this same conclusion. Specifically, the trial judge noted, "I didn't take it in the same sense that you [defense counsel] did." The trial judge is in a better position to observe and decide if a remark is improper. *James W. Sessums Timber Co. v. McDaniel*, 635 So.2d 875, 882 (Miss. 1994). We also note that jurors are by nature understandably inquisitive and when a sole defendant is on trial for an indicted crime wherein the evidence clearly reveals that there is more than one person who most likely is criminally culpable, conscientious jurors want to know the status of those other individuals. Lawyers and judges know – but not jurors – that when more than one individual is indicted for a crime, whether it be by way of a separate indictment or a multi-count indictment, quite often, and out of necessity, the trials of the defendants will be severed. *See* URCCC 9.03. While it is clearly reversible error for the State to inform the jury that a co-defendant of a defendant on trial has previously been convicted for the same offense, it is altogether different and not improper for the jury to know that there are other persons who have yet to be tried for the same offense for which the defendant is then on trial. In other words, the prosecution tries multiple defendants one at a time.

¶125. Prosecutors are limited to arguing facts introduced in evidence, deductions and conclusions that may be reasonably draw therefrom, and application of law to facts. *Ivy v. State*, 589 So.2d 1263, 1266 (Miss. 1991). With that limitation in mind, attorneys are permitted wide latitude in arguing their respective positions and theories to the jury. *Campbell v. State*, 437 So.2d 3, 5 (Miss. 1983); *Holland*, 705 So. 2d at 345. In fact, "'the very purpose of an advocate is to help the jury draw conclusions from the evidence and to make suggestions as to a proper conclusion.'" *Evans v. State*, 725 So. 2d at 671 (quoting *Blue v. State*, 674 So. 2d 1184, 1208 (Miss. 1996)). There was ample evidence presented at trial regarding Gillis's involvement in this crime, including Byrom's and Junior's statements, and the disputed

48

comment by the prosecutor was nothing more than a comment on that evidence, which had been received without any objection from Byrom.

¶126. Finally, Byrom has failed to assert, or even demonstrate, that she suffered any prejudice as a result of these comments. Therefore, this assignment of error is without merit.

**XI.** **WHETHER THE TRIAL COURT ERRED IN REFUSING THE DEFENDANT'S REQUESTED JURY INSTRUCTION CONCERNING ACCESSORY AFTER THE FACT.**

¶127. Byrom next claims error in the denial of Instruction D-17, an accessory after the fact instruction. Proposed Instruction D-17 provided as follows:

If you find from the evidence in this case beyond a reasonable doubt that:

1.      Michelle Byrom on or about June 6, 1999, or June 7, 1999, in Tishomingo County, Mississippi, concealed, aided or assisted Edward L. Byrom, Jr., by misleading law enforcement authorities with untrue information concerning an alleged conspiracy of Michelle Byrom with Joey Gillis and/or others; and

2.      Michelle Byrom knew that Edward L. Byrom, Jr. had committed murder, and that Edward L. Byrom, Jr. had in fact completed the commission of murder, which is a felony under the laws of Mississippi, and

3.      Michelle Byrom performed the actions with the intent of enabling Edward L. Byrom, Jr. to escape or avoid arrest, conviction or punishment after Edward L. Byrom, Jr. committed murder,

then you shall find the defendant guilty of Accessory After the Fact.

¶128. The trial judge heard argument on the use of this instruction and ultimately refused to submit it to the jury, finding that the instruction was not founded on the evidence in the case. Byrom asserts this refusal as error, claiming her theory that she was trying to protect her son by concocting a conspiracy to kill her husband was supported by substantial evidence at trial and therefore the instruction was proper. The State submits that accessory after the fact is a separate crime and is not a lesser-included offense of capital

49

murder. Alternatively, it argues that Byrom's proposed instruction (1) is not supported by the evidence; (2) is confusing; and (3) was adequately covered by another instruction.

¶129. The standard of review for challenges to the failure to submit jury instructions is as follows:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Heidel v. State*, 587 So.2d 835, 842 (Miss. 1991) (internal citations omitted).

¶130. In support of its argument that accessory after the fact is a separate crime and is not a lesser-included offense of capital murder, the State cites *Wilcher v. State*, 455 So. 2d 727 (Miss. 1984), wherein this Court held:

> We have repeatedly held that the crime of accessory after the fact is an entirely separate and distinct offense and not a constituent part of an offense so as to be a lesser included offense. In *Box v. State*, 241 So.2d 158 (Miss. 1970), this Court held that accessory after the fact is a distinct crime for which a person cannot be punished unless indicted. Wilcher was not indicted on a charge of accessory after the fact of murder and therefore, an instruction on that offense would have been improper and would have constituted reversible error.

455 So. 2d at 734.

¶131. However, in *Gangl v. State*, 539 So. 2d 132 (Miss. 1989), this Court allowed "lesser offense" instructions, as opposed to "lesser-included-offense" instructions and held that "the defendant may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid out in the indictment." *Id.* at 136 (quoting *Griffin v. State*,

533 So.2d 444, 447-48 (Miss. 1988)). However, the Court went on to state that "lesser offense instructions should not be granted indiscriminately, and only where there is an evidentiary basis in the record." *Gangl*, 539 So.2d at 136 -37.

¶132. The elements of accessory after the fact are that: (1) a completed felony has been committed; (2) the accused concealed, received, relieved, aided, or assisted a felon, knowing that such person had committed a felony; and (3) such assistance or aid was rendered with the intent to enable such felon to escape or avoid arrest, trial, conviction, or punishment after the commission of such felony. Miss. Code Ann. § 97-1-5 (Rev. 2000); *Buckley v. State*, 511 So.2d 1354, 1358 (Miss. 1987).

¶133. Byrom argues that Junior's testimony establishes that he killed Byrom, Sr. and that the jailhouse letters exchanged between Byrom and Junior clearly evinced an attempt to pin the murder on Gillis. She argues that this testimony and other evidence presented at trial establishes that she was simply trying to keep Junior from being blamed for Byrom, Sr.'s death.

¶134. The State argues that the record not only fails to support Byrom's theory that she was trying to protect Junior, but it contradicts it. The State further points out that, although Byrom did make statements related to Junior's innocence in a handwritten confession and in the statement she gave to Dance, Byrom also made numerous statements to law enforcement that implicated Junior in his father's murder.

¶135. On June 6, 1999, Byrom told Sheriff Smith that Junior knew the murder was going to occur, just not when. She also said Junior came to the hospital and told her "it was done." She further stated that, "toward the end [Junior] was in on ever [sic] conversation because Joey [Gillis] was with him twenty-four seven." In addition, she said that she knew Junior was in on the murder "with Joey [Gillis] hanging around with him constantly" Byrom did say that she did not think Junior could have shot his own father, "even though there was a lot of hatred there." In addition, Byrom's theory of the case was that Junior killed his

51

father on his own, without her encouragement or Gillis's assistance. The actions taken and the statements made by Byrom indicate that she was more interested in exonerating herself than her son.

¶136. The evidence presented at trial clearly demonstrated Byrom's involvement prior to this crime. In fact, the evidence leads to the unavoidable conclusion that she was the mastermind of the plot to kill her husband. She gave incriminating statements to law enforcement that described her conversations with Gillis and others regarding having her husband killed. She told law enforcement that she offered Gillis $15,000 to have her husband killed, and she knew that two attempts upon his life had been unsuccessful before he was finally murdered. Junior's statement revealed that his mother told him where his father had hidden the pistol that was used to kill him.

¶137. Based upon the foregoing facts, there simply was no evidence to support Byrom's proposed instruction. As this Court held in *Chase v. State*, 645 So. 2d 829 (Miss. 1994):

> There is no evidentiary basis for granting an accessory after the fact instruction in the present case. "An accessory after the fact is a person assisting one who has completed the commission of a felony to avoid being apprehended, arrested, convicted, etc." [(citations omitted). The appellant] admitted to . . . participating in . . . events which occurred both before and after the murder. His admission made him a principal to the crime and precluded the granting of the instruction.

645 So. 2d at 851.

¶138. Similarly, Byrom's confessions regarding her involvement in the conspiracy to murder her husband foreclosed the granting of this instruction. Her involvement made her a principal to the crime and granting an instruction that she could be found guilty of an accessory after the fact would have been erroneous. Therefore, this assignment of error is without merit.

## XII. WHETHER THE TRIAL COURT ERRED IN LIMITING THE CROSS-EXAMINATION OF ERIC BYROM.

¶139. Eric Byrom, the nephew of the victim, testified for the State on direct examination that he had been to the Byrom house on the day of the murder and had seen Gillis and Junior there. Eric testified that he and Junior went to Burnsville, and Junior asked Eric, "Do you know what's going on? And [Eric] didn't, so [Eric] said, No, what's up? And [Junior] says, We're - we're planning on having dad killed." Eric testified that he "took that in jest," and did not believe Junior "in the least bit." He further testified that Junior told him that he "didn't need to be around."

¶140. The record reveals that Eric was questioned on the day of the murder and that his statement given at that time was inconsistent with a statement he later gave. This subsequent statement was consistent with his trial testimony. In the first statement, which was recorded, Eric told law enforcement that he did not know anything at all about the murder. During cross-examination of Eric, Byrom's counsel sought to introduce this recorded statement to impeach the testimony Eric gave on direct examination. The State objected.

¶141. Outside the presence of the jury, defense counsel argued that the tape should be played to the jury. They argued "it's absolutely very probative of his credibility" as it demonstrates how adamantly Eric denied having any knowledge of a conspiracy to kill Byrom, Sr. The State objected to the playing of the tape, arguing that it was not the proper way to impeach a witness. The State argued that the proper way was to ask Eric if he said something, then if he denies it, impeach him with his statements on the tape. The State further argued that the tape was inadmissible in its entirety because it involved various extraneous statements, such as evidence of Eric's conviction for a unrelated crime, that were completely irrelevant. The trial judge refused to allow the tape to be played, ruling that it was "irrelevant, extraneous, an attempt to, I guess, impeach this witness or some something. I'm not certain exactly what it is." The trial judge also stated that the defense counsel would be allowed to bring out any inconsistencies in Eric's testimony, then

continued, "[b]ut to just question him and then tender a tape and a transcription of what testimony or statement he might have made earlier is not a proper way to get this into evidence."

¶142.  Byrom's brief is unclear as to exactly what benefit playing the tape would have achieved or how it was relevant.  She argues that the trial judge erred by allowing the State to rehabilitate Eric prior to her counsel having a chance to impeach him.

¶143.  After questioning Eric regarding his second statement to law enforcement, the district attorney asked him:

> Q:      The first time you talked with the police, Eric - - that was the early morning hours
>         of, I believe, June 4th - - did you cooperate?
> A:      No, sir.
>
>         MR. WOOD:    Objection, your Honor.  It's inappropriate on    direct
>                      examination.  The witness' statement has      not been
>                      attacked at this point.
>         THE COURT:  Objection overruled.
>
> Q:      Did you later, Eric, give them a full statement of what happened and the
>         knowledge that you had?
> A:      Yes, sir.  That is correct.

Thereafter, the State yielded for cross-examination.

¶144.  We find nothing improper about the district attorney's questions. He was merely utilizing a familiar trial technique and pointing out an inconsistency in the witness's behavior. *See* M.R.E. 607 ("The credibility of a witness may be attacked by any party, including the party calling him.").

¶145.  Byrom does cite ***Johnson v. State***, 655 So. 2d 37, 41-42 (Miss. 1995), where this Court held that the trial court did not err in permitting the State to use a tape to impeach a witness to prove the demeanor of the witness at a certain time, for the proposition that attorneys should be given broad latitude and the trial judge should not interfere or restrict their proof, except in clear cases of irrelevancy.

¶146.   This is a proper statement of the law, but it is not on point. ***Johnson*** involved assaults on police officers, and the issue was whether the trial court erroneously admitted a videotape of the accused made during the booking procedures.   The booking video was admitted to impeach the testimony of the appellant's family members, who indicated that the appellant had been calm on the night of his arrest.  As this Court noted in ***Johnson***:

> *If the witness denies the making of the statement or fails to admit it*, for example by saying 'I don't know' or 'I don't remember', then *the requirement of "laying the foundation is satisfied* and the cross-examiner, at the next stage of giving evidence, may prove the making of the alleged statement." ***McCormick on Evidence***, § 37 (John W. Strong et al. eds., 1992).

***Johnson***, 655 So. 2d at 41 (emphasis added).

¶147.   Prior to defense counsel's attempt to play the tape, the only statement Eric had denied knowledge of making was that he did not recall asking the officers if Byrom had been drugged up when she indicated to them that he had something to do with the conspiracy to murder Byrom, Sr.   Additionally, defense counsel introduced the fact that Eric suffered from Tourette's syndrome.[16] Following this evidence, defense counsel sought to introduce the tape.

¶148.   We conclude that no foundation had been laid for impeaching Eric.  At this point, the only evidence presented that might contradict the taped statement was that Eric did not recall asking if Byrom had been "drugged up."  This single statement did not open the door for playing the entire tape.  Byrom had failed to demonstrate that Eric's testimony contradicted statements given in the remainder of the tape.

¶149.   Upon resumption of the trial, defense counsel cross-examined Eric regarding his statement. Eric did state during cross-examination that he did not recall several things from this taped interview, such as

---

[16]A neurological disorder.  A chemical imbalance that manifests itself in twitches and tics, muscle spasms, and the more stressful the situation, the more manifestation occurs.

his being "out of control" during the interview; officers telling him that he "talked goofy;" and that he sounded like "somebody out in left field." These statements were in fact made. However, defense counsel did not attempt to use the taped statement, of which he had a transcript, to impeach Eric regarding these statements.

¶150.   We conclude that this evidence was properly excluded.  Eric never denied that he lied to law enforcement in the initial interview.  There was nothing on which to impeach him.  Defense counsel had not laid a foundation sufficient to play this entire tape.  The trial judge stated that he would allow defense counsel to impeach any inconsistent statements, but when Eric offered inconsistent testimony, defense counsel did not refer to the inconsistency.

> "The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." *Johnston v. State*, 567 So.2d 237, 238 (Miss. 1990), citing *Hentz v. State*, 542 So.2d 914, 917 (Miss. 1989), *Monk v. State*, 532 So.2d 592, 599 (Miss. 1988). Unless the trial judge's discretion is so abused as to be prejudicial to the accused, this Court will not reverse his ruling. *Shearer v. State*, 423 So.2d 824, 826 (Miss. 1983), citing *Page v. State*, 295 So.2d 279 (Miss. 1974).

*Parker v. State*, 606 So.2d 1132, 1136 (Miss. 1992). All the evidence and inferences that defense counsel sought to introduce through admission of this tape were before the jury.  Therefore, its exclusion, based upon the irrelevant and extraneous materials contained therein, as well as the lack of a proper foundation supporting its introduction, was not an abuse of discretion. This assignment of error is without merit.

## XIII.   WHETHER THE TRIAL COURT ERRED IN PERMITTING JAMES TRIMM TO TESTIFY ABOUT THE ACTIONS OF HIS DOG WITHOUT A SHOWING OF ANY EXPERTISE OF TRIMM.

¶151.   Byrom next asserts error in the testimony of former Sheriff's Deputy James Trimm, regarding the actions of Trimm's trained canine, Kietchi. Trimm testified that Kietchi tracked Gillis's scent from the spot

where Junior let Gillis out of the car, to the Byrom home, and then back to the spot where Junior picked Gillis up afterwards. Byrom claims that the dog's tracking qualifications were not properly established in the record and thus, she argues, the trial court erred in allowing testimony regarding the dog's actions.

¶152. The defense objected twice during Trimm's direct examination. However, both objections, which were overruled, dealt with the "availability" of the dog (who died of cancer prior to the trial). Byrom failed to object to the qualifications of the dog. Accordingly, as the State argues, the issue of the dog's qualifications is procedurally barred. *See Doss v. State*, 709 So. 2d 369, 378 (Miss. 1996) ("[A]n objection on one or more specific grounds constitutes a waiver of all other grounds.") (quoting *Conner v. State*, 632 So. 2d 1239, 1255 (Miss. 1993)).

¶153. Additionally, this issue lacks legal merit. Byrom argues that testimony of this type is admissible only after it had been proven that the dog (1) is a pure breed, (2) is well trained and (3) has been tested and found to be reliable. Byrom cites *Hinton v. State*, 166 So. 762, 723 (Miss. 1936) (quoting *Harris v. State*, 143 Miss. 102, 108 So. 446, 446-447 (1926), as authority in support of her position.

¶154. The cases cited by Byrom are easily distinguishable from the case at bar. Kietchi, the dog at issue, was a German shepherd, not a bloodhound. Kietchi did not lead the police to the accused; rather, he confirmed what Junior had already told the officers, i.e., where Gillis was dropped off and picked up before and after the crime. *See Chisolm v. State*, 529 So. 2d 630, 635 (Miss. 1988) (affirming where "the prosecution offered no evidence regarding the 'qualifications of the bloodhounds'" that led the officer to the residence where the appellant had been earlier, when "the evidence reflects that far more than the canine sense of smell led" authorities there).

¶155. Kietchi was highly trained and certified for law enforcement purposes, and his qualifications are evident from the record. Kietchi was trained when he was purchased, but he had additional training with

Trimm, so that Trimm would know what the dog was doing. Trimm and his dog were certified through the Mid-South Police Canine Association on July 3, 1998. After the certification and for approximately one year prior to this murder, Trimm worked with Kietchi at least one day a week to maintain the dog's training. This involved getting officers from other areas to hide objects for the dog to find. The dog hit every single time on drugs and articles of clothing. The dog was trained in narcotics, tracking, and apprehension. He could track the scent of any type article.

¶156. Byrom is procedurally barred from asserting this testimony as error on appeal based upon her failure to properly object at trial. Alternatively, the qualifications of Kietchi to perform the type of police activity he did in this case are beyond reproach, and they were well documented at trial. Furthermore, based upon his training with the dog and his certification as the dog's handler, as well as the fact that he worked with the dog at least one day a week for a year prior to this murder, Trimm was qualified to testify regarding the dog's actions. This assignment of error is also without merit.

> ### XIV. WHETHER THE TRIAL COURT ERRED IN CHARGING THE JURY IN A MANNER SIMILAR TO LANGUAGE IN THE INDICTMENT AND IN SPECIFICALLY REFUSING TO CHARGE THE JURY THAT IT MUST FIND THAT THE DEFENDANT OFFERED SOMETHING OF VALUE TO JOEY GILLIS FOR THE MURDER BEFORE IT COULD FIND HER GUILTY OF CAPITAL MURDER.

¶157. Byrom next claims that the jury was improperly instructed with regard to the elements of this crime. The instruction at issue provided as follows:

> The defendant, Michelle Byrom, has been charged by Indictment with the crime of Capital Murder for having caused the death of Edward Byrom, Sr. If you find from the evidence in this case beyond a reasonable doubt that the defendant either acting alone or in concert with another or others, without authority of law, caused the death of Edward Byrom, Sr., a human being, after having offered, *having been offered, or having received something of value*, *for the murder or was a party to such offer or*

*receipt of anything of value*, for the murder of Edward Byrom, Sr., then you shall find the defendant, MICHELLE BYROM, guilty of Capital Murder.

If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant not guilty.

(emphasis added).

¶158. Byrom argues that the instruction was confusing because it contained language which did not apply to the facts of this case. She asserts that the trial court erred by not simply instructing the jury "that it should find Ms. Byrom guilty if it finds she offered something of value to Gillis for the murder of Byrom, Sr." She argues that the "having been offered, or having received something of value" and "or was a party to such offer or receipt" language in the instruction was confusing. During trial she argued that it may have made the jury think that there were facts in the case that they were not told.

¶159. This instruction was discussed at length, and the trial judge removed a portion of the language from the instruction that Byrom had found objectionable in the indictment (i.e., "or participated in any way" in the murder of Edward Byrom, Sr.). The instruction was reworded to the form stated above, and the defense posed no further objection to the instruction as reworded.[17]

¶160. The only case Byrom cites in support of this argument is *Stewart v. State*, 662 So. 2d 552 (Miss. 1995), the same case she cited previously with regard to the alleged errors in the indictment. Byrom points out that, at trial, she offered an indictment from *Stewart* during the argument on the motion to quash.

¶161. Initially, *Stewart* did not addressed an instruction similar to the one Byrom insists should have been given, nor did it announce that such an instruction should always be given. As this is the only authority Byrom cites in support of her argument, this "[f]ailure to cite relevant authority obviates [our] obligation to

---

[17]Therefore, Byrom's asserted error on this issue is barred because she failed to object to the final form of the instruction at trial. *See Evans v. State*, 725 So. 2d at 632 (issues not presented to the trial judge are "procedurally barred and error, of any, is waived. This rule is not diminished in a capital case.").

review such issues." *Simmons v. State*, 805 So. 2d at 487 (citing *Williams v. State*, 708 So. 2d at 1362-63). However, we will discuss the merits of this assignment of error.

¶162. The State argues that, in addition to being procedurally barred, this issue is without legal merit. The State contends that the instruction tracks the language of the applicable statute, Miss. Code Ann. § 97-3-19(2)(d), and points out that this Court has "consistently held that instructions in a criminal case which follow the language of a pertinent statute are sufficient." *Crenshaw v. State*, 520 So. 2d 131, 134 (Miss. 1988). The State also argues that previous claims, identical to Byrom's contention that an instruction was confusing, have been squarely rejected by this Court. In support of this argument, the State cites *Nixon v. State*, 533 So. 2d 1078 (Miss. 1987), wherein this Court held:

> Nixon contends he was denied a litany of constitutional rights by jury instruction 3. Part 3 of jury instruction 3 instructed the jury that Nixon should be found guilty of capital murder if he "had been offered or had received money for committing such murder, if any; . . . " That language tracks Miss. Code Ann. § 97-3-19 (2) (d) (Supp. 1986).

*Nixon*, 533 So. 2d at 1095. Thus, the State argues, Byrom asks this Court to hold the trial judge in error for following the language of the statute and the precedent of this Court.

¶163. "A circuit judge has a responsibility to see that the jury is properly instructed." *Duvall v. State*, 634 So.2d 524, 526 (Miss. 1994) (internal citations omitted). In the case sub judice, the trial judge did not err in instructing the jury. This instruction was consistent with the statute and the indictment, which we found to be legally sufficient, and this instruction in no way could have confused or misled the jury into a verdict unsupported by the evidence. *Crenshaw v. State*, 520 So.2d at 134; *Johnson v. State*, 475 So.2d 1136, 1140 (Miss. 1985). Therefore, this issue is without merit.

## XV. WHETHER THE TRIAL COURT ERRED IN SENTENCING THE DEFENDANT TO DEATH.

¶164. Finally, Byrom claims that the trial judge erred in sentencing her to death. Byrom argues that there was (a) insufficient evidence of the aggravating factor that this crime was committed for pecuniary gain, Miss. Code Ann. § 99-19-101(5)(f) (Rev. 2000); and (b) the trial court failed to give proper consideration to the mitigating factors, *Id*. § 99-19-101(6).

## A. Evidence Supporting the Aggravating Factor of Pecuniary Gain.

¶165. Byrom told Sheriff Smith that she was going to pay Gillis when she collected the insurance money. She told Dance that she arranged to pay Gillis after the murder because she would not have the money until she got her husband's life insurance proceeds, which she thought was approximately $150,000.[18] Byrom knew that the insurance proceeds would pay off her house and vehicle if something happened to her husband. After her husband was killed, Byrom planned to join Gillis and Junior in Florida, after she "took care of business up here, got everything settled, the house sold, and all that." Junior testified that Byrom was unemployed and in poor health. He also stated that, about a month before the murder, Byrom said she would pay $10,000 from the insurance money to have her husband "taken care of." Byrom admitted in both of her introduced statements that she tried to solicit at least one other person to kill her husband.

¶166. Byrom argues that the preceding evidence was insufficient to establish that this crime was committed for pecuniary gain. We disagree. Although Byrom did not know the exact amount of insurance her husband carried, she thought it was $150,000. Although Byrom's statements that she was planning on moving to Florida were not brought out in testimony, they were included in her statements, which were in evidence. We conclude that sufficient evidence existed to support the finding that this crime was committed for pecuniary gain.

## B. Mitigation Factors.

---

[18]Actually, it was closer to $400,000 in insurance coverage and benefits.

¶167. Byrom had requested the trial judge to consider the following statutory mitigating circumstances: (1) that Byrom had no significant history of prior criminal activity; (2) that the crime was committed while Byrom was under the influence of extreme mental or emotional disturbance; (3) that Byrom, Sr. was a participant in Byrom's conduct due to his actions having provoked his own death because of his abusive behavior; and, (4) that Byrom's capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law was substantially impaired.

¶168. The trial judge found that two of Byrom's mitigating factors, numbers (3) and (4), did not bear consideration. Finding that the mitigating factors did not outweigh the aggravating factor of pecuniary gain, the trial judge sentenced Byrom to death. Viewing the complete findings of the trial judge regarding the weighing of aggravating and mitigating circumstances,  we find no error in his assessment:

> The Court has further considered as the sole aggravating factor or circumstance to be considered in fixing a penalty in this case that he [sic] crime was committed for pecuniary gain.  It seems evident that a motivating factor in bringing about the death of Edward Byrom, Sr., was the fact that financial gain would result so that this defendant, along with the other two defendants charged in this same occurrence, would have the benefit of whatever proceeds of insurance and other property that the deceased might have.

> The Court, likewise, considered the mitigating factors, specifically, that the defendant had no prior criminal record of any kind, so far as the record indicates.  And, further, the Court has considered the assertion that the defendant was acting while under the influence of some extreme mental or emotional disturbance.  Parenthetically, the Court would observe that these factors are the only factors suggested which would appear and bear consideration by this Court.

> The Court is required, as the jury would be, in considering these factors and to weigh them each against the other; and in the event the mitigating factors are such as to overcome or outweigh the aggravating factors, the Court, the jury and the Court, would be in the position of not being capable or allowed under the law to return a verdict which included imposition of the death penalty.

> The Court finds beyond a reasonable doubt that the aggravating factor, that of being motivated or acting for pecuniary gain, exists.  The Court is of the opinion that the

mitigating factors considered by the Court do not outweigh the aggravating circumstances, including the facts and the taking of the life of the victim in this case.

¶169. By his on-the-record findings and his subsequently entered sentencing order, the trial judge clearly *considered* all the mitigating circumstances. The trial judge appropriately considered all the mitigating factors, and he properly weighed the aggravating and mitigating circumstances in reaching his sentencing decision. Therefore, this issue is without merit.

## SECTION 99-19-105(3) REVIEW

¶170. As a final matter, we must also review the death sentence in accordance with Miss. Code Ann. § 99-19-105(3) (Rev. 2000), which states:

> (3) With regard to the sentence, the court shall determine:
> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
> (b) Whether the evidence supports the jury's or the judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
> (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error or both.

¶171. Under this analysis, there is no evidence supporting a finding that the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. As previously discussed, the evidence supports the trial court's finding that the statutory aggravating factor of pecuniary gain was proven beyond a reasonable doubt. Upon comparison to other factually similar cases where the death sentence was imposed, the sentence of death is not disproportionate in this case. Giving the equally heinous nature of the crime committed here, imposition of the death penalty on Michelle Byrom is neither excessive nor

disproportionate in comparison to her crime. Having given individualized consideration to Byrom and the crime in the present case, this Court concludes that there is nothing about Byrom or her crime that would make the death penalty excessive or disproportionate in this case. See Appendix.

## RESPONSE TO PRESIDING JUSTICE McRAE'S DISSENTING OPINION

¶172.   We feel compelled to address at least to some degree Presiding Justice McRae's dissent wherein he has once again chosen to direct disparaging remarks toward certain members of this Court.  His disparaging remarks are not always directed toward the same individual members – it just depends on who has taken a view opposite from his.  This time the members in the majority are described as "underhanded and manipulative."  Who knows what vilifying adjectives he will choose to describe those who disagree with him in the next case?  Only time will tell.  We choose however not to reciprocate in kind by way of personal attacks on Presiding Justice McRae.  Instead,  we will simply and calmly address Presiding Justice McRae's statements contained in the first five pages (and the first three lines on page 6) of his dissent.

¶173.   Presiding Justice McRae expresses disdain for the "majority's underhanded and manipulative tactic of 'voiding' the vote of Justice Diaz in this proceeding," and for the fact that Justice Diaz's already recorded votes and written opinions in pending cases are not being allowed to stand.  (Dissenting Opinion * 1).  The cold hard facts are that Justice Diaz requested a voluntary leave of absence from this Court until certain personal matters were resolved, and this Court by order handed down on August 7, 2003, granted Justice Diaz's request to "take a leave of absence from the Court."  The vote on that order was 7-1, with Presiding Justice McRae dissenting.

¶174.   To support his position that Justice Diaz's recorded votes and opinions existing as of August 7, 2003, should be allowed to stand, Presiding Justice McRae relies heavily upon the case of *Amiker v. Drugs for Less, Inc.*, 796 So. 2d 942, 948 (Miss. 2001), and its holding "that a successor judge does

not possess the power to vacate an initial judge's order granting a new trial where, as here, the successor judge sits in an inferior position to the first judge." In *Amiker*, Judge Coleman, inter alia, set aside a jury verdict, granted a judgment of liability, and ordered a new trial and attorney fees. *Id.* at 945. During the ongoing appeals, Judge Coleman **retired** and Judge Yerger was appointed to fill his vacancy. *Id.* Judge Yerger heard arguments on subsequent motions and entered an Opinion and Order which vacated the orders previously entered by Judge Coleman. *Id.*

¶175. In determining whether a successor judge has the power to "vacate an initial judge's order granting a new trial and issuing sanctions for discovery violations which came to light in the trial," this Court held that a successor judge did not have such power. *Id.* 946, 948. This Court looked for guidance to *Mauck v. Columbus Hotel Co.*, 741 So. 2d 259 (Miss. 1999), in which we upheld a successor chancellor's authority to vacate the initial chancellor's pretrial order denying summary judgment because "[a]n order denying summary judgment is neither final nor binding upon the court or successor courts." *Id.* at 268. We held that "[a]s a general rule, a successor judge is precluded from correcting errors of law made by his predecessor or changing the latter's judgment or order on the merits, *but this rule does not apply where the order or judgment is not of a final character*." *Id.* We found the facts of *Amiker* to be distinguishable from the facts of *Mauck* as *Amiker* involved a case on the merits which had been tried, rather than a pretrial motion. 796 So. 2d at 946-47. Likewise, the facts of *Amiker* can be distinguished from the factual situation with which this Court is faced today. There is no successor judge replacing Justice Diaz; therefore, this Court is not faced with an inferior judge usurping the authority of a superior judge. This Court is not invalidating any vote by Justice Diaz on any case which has previously been handed down, nor are we invalidating any previously handed-down opinion which Justice Diaz authored. The cases and

65

circulating opinions presently pending before this Court, like the pretrial motions in *Mauck*, are not "of a final character" and are subject to change until they are handed down, and Presiding Justice McRae knows that. Therefore, the only logical administrative approach to this scenario is to simply not record Justice Diaz's previous vote on any opinions yet to be handed down, and to have those pending cases previously assigned to Justice Diaz reassigned to the remaining justices. This has been done. Any other approach is nonsensical.

## CONCLUSION

¶176. As so noted, we have found in this case that during this trial, there were instances of error committed by the trial court. With the numerous difficult decisions (pretrial, trial, and post-trial) which the learned circuit judge was called upon to make, many of which had to be made with only a few seconds of deliberation, errors will be made. That is a fact of life. However, we have never held that a criminal defendant was entitled to a perfect trial, even with our heightened scrutiny in death penalty cases. A perfect trial is simply impossible. A defendant is entitled, however, to a constitutionally fair trial under our federal and state constitutions. We are satisfied that Michelle Byrom did receive a constitutionally fair trial.

¶177. For the foregoing reasons, we affirm both the judgment of conviction of capital murder and the imposition of the death penalty as rendered in the Circuit Court of Tishomingo County.

¶178. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**SMITH, P.J., WALLER, COBB AND EASLEY, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. PITTMAN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., AND GRAVES, J. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**PITTMAN, CHIEF JUSTICE, DISSENTING**:

¶179.   There are some cases where the difference between error and affirm is so close that reasonable people may disagree. Though the majority recognizes the several errors that occurred during the trial, it fails to see the significance of such errors.  Believing such errors were too significant for a capital trial,  I dissent and would reverse the conviction and sentence and remand this case for a new trial.  For the sake of brevity, I discuss only the two most significant errors: the exclusion of the pornographic home video and the exclusion of the jailhouse letters.

¶180.   First, the trial court erred by excluding the home video from evidence in both the guilt and sentencing phases.  This video was critical to the defense and should have been admitted despite the graphic depictions.  "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."  ***Chambers v. Mississippi***, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). While I appreciate the fact that our trial courts are charged with both maintaining the dignity of our courts and accounting for juror sensitivities, the defendant's right to put forward a defense is paramount.

¶181.   Turning to the jailhouse letters, the majority holds that by failing to disclose the letters Byrom violated the rules of discovery and therefore the trial court correctly excluded  them. URCCC 9.04(I) provides the trial court several options when discovery violations become apparent during a trial, including excluding the evidence or granting a continuance or mistrial.  The letters were too important to simply exclude, and the jury should have been allowed to consider their veracity.

¶182.   It is a well known principle that capital murder convictions are subject to heightened scrutiny.  That said, all bona fide doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." ***Snow v. State***, 800 So.2d

472, 477 (Miss. 2001); *Balfour v. State*, 598 So.2d 731, 739 (Miss. 1992); *Fisher v. State*, 481 So.2d 203, 211 (Miss. 1985); *Irving v. State*, 361 So.2d 1360, 1363 (Miss.1978).

¶183. We have held that individual errors, not reversible in themselves, may combine with other errors to make up reversible error. *Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991); *Griffin v. State*, 557 So. 2d 542, 553 (Miss. 1990). Such a finding requires a determination of whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial. *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987).

¶184. In the instant case, the errors raised on appeal are too numerous and too significant to affirm. Accordingly, I respectfully dissent and submit that the conviction and sentence should be reversed and this case be remanded for a new trial.

**McRAE, P.J., AND GRAVES, J., JOIN THIS OPINION.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶185. I object to the majority's underhanded and manipulative tactic of "voiding" the vote of Justice Diaz in this case. Although Justice Diaz has taken a leave of absence effective August 7, 2003, his votes regarding pending matters before such date should not be voided and should be allowed to stand. His leave of absence does not destroy his office. Justice Diaz is still a Justice of this Court and as such his votes and opinions regarding issues prior to this Court's order on August 7, 2003, accepting his leave of absence are still in effect. Essentially, his leave of absence only means that cases on appeal to this Court after August 7, 2003, on which votes have not been cast and opinions have not been prepared, are the only

cases on which he is not participating and for which he will not be voting. By effectively "voiding" the votes and deleting the majority and dissenting opinions of Justice Diaz on matters which occurred prior to his leave of absence, the majority has manipulated the outcome of cases which were to be determined by a "close vote." Justice Diaz is still a member of this Court, even if he is on a "leave of absence." Furthermore, as for the merits of the present appeal, even though the individual errors presented in this appeal may not constitute reversible error, taken together the errors cumulatively warrant reversal. Therefore, I dissent to the majority's unilateral attempt to disregard Justice Diaz's vote and to the majority's holding which ignores the cumulative effect of the errors below.

¶186.   Although there is no case law in this jurisdiction regarding judicial leave of absence and the effect of such undertaking upon the decisions and votes of a Justice or Judge, other cases and statutes from this jurisdiction and others regarding leave of absence in general give guidance to the true nature and current status of Justice Diaz. The determination of whether Justice Diaz's votes may be "voided" and whether his prepared opinions in accordance with such votes should go unpublished, turns upon whether a "leave of absence" has such an effect upon his "authority" or whether a "vacancy" of office or "disqualification" as to that particular case is required.

¶187.   It is clear that a "vacancy" of office would lead to the "voiding" of a Judge's votes, not yet published opinions, and/or release of orders. Such a finding is contemplated by not only our Constitution, but also by statute. *See* Miss. Const. art. 6, § 177;  Miss. Code Ann. § 23-15-849.  "Vacancy" as defined by Black's Law Dictionary is "1. The state of fact of a lack of occupancy of office. . . 2. the time during which an office . . . is not occupied. 3.  An unoccupied office . . . An officer's misconduct does not create a vacancy even if a suspension occurs; a vacancy, properly speaking, does not occur **until the officer is officially removed**." Black's Law Dictionary 1254 (7th ed. 2000) (emphasis added).  The legal

69

definition of "vacancy" contemplates removal from office, not an "absence" from office. Although "vacancy" for the purposes of judicial office has not been defined by this Court, the Attorney General has had the opportunity to define "vacancy" for the purposes of municipal office which by definition is closely akin to the law regarding appointment and elections for vacancies in a seat of the judiciary. *See* Miss. Code Ann. §§ 9-1-103 (stating in relevant part that "[w]henever a vacancy shall occur in any judicial office by reason of death of an incumbent, resignation or retirement of an incumbent, removal of an incumbent from office, or creation of a new judicial office in which there has not theretofore been an incumbent . . . ").[19] The Attorney General defined "vacancy" in a municipal office as "when there is a resignation, death, disqualification as a municipal elector, conviction of a felony, or removal by order of a court of competent jurisdiction." Atty. Gen. Op. No. 2002-0120, 1 (Presley) (March 22, 2002). The Attorney General went on to state that "[n]o vacancy is created by virtue of an office holder taking military leave." *Id.* "Military leave" is in essence a "leave of absence," as such no "vacancy" is created by a "leave of absence" even under the current circumstances.

¶188. Also, much can be said about the "authority" of Justice Diaz over those cases which were before this Court and for which he has already cast his vote and written a separate opinion. The "authority" vested in Justice Diaz to oversee and adjudicate matters before this Court is granted not only by the Mississippi Constitution but by statute. *See Ex parte Seidel*, 39 S.W.3d 221 (Tex. Crim. App. 2001). Justice Diaz's eligibility for judicial office is controlled by Article 6, Section 150. Miss. Const. art. 6, § 150. His term of office is controlled by Article 6, Section 149 which provides for an eight-year term of office upon election. Miss. Const. art. 6, § 149; Miss. Code Ann. § 23-15-991. While in office, Justice Diaz functions

---

[19] *See also* Miss. Code Ann. §§ 9-1-105, 9-3-12, & 9-19-13.

70

as a member of the judiciary with all the powers vested in his office and the Supreme Court by the Mississippi Constitution; therefore only under specified and limited circumstances may his powers be limited. *See Phillips v. State*, 24 So.2d 226 (Ala. Ct. App. 1945). As an elected official, only under limited circumstances may he be removed from office. Miss. Const. art. 4, §§ 49 to 53. If Justice Diaz were rendered "disqualified" from a particular pending matter, his rulings upon that particular matter would be prohibited and instead a special justice could be appointed to preside and rule in his place. Miss. Const. art. 6, § 165; Miss. Code Ann. § 9-19-3; M.R.A.P. 48(c). Any "removal" or "resignation" of Justice Diaz from his judicial office would create a "vacancy" in office which would support the appointment and/or election of a special justice to fill his office. Miss. Const. art. 6, § 177; Miss. Code Ann. §§ 9-1-103; 9-3-12; 9-19-17; 23-15-843; 23-15-849. Of course, a "removal" and/or "disqualification" would operate to "void" the vote and/or opinion of Justice Diaz, however those votes, orders, and/or opinions cast and prepared before such time are not "void" and are in full effect. *See Schwartz v. Schwartz*, 431 So.2d 716 (Fla. Dist. Ct. App. 1983); *Weiss v. Miami National Bank*, 320 So.2d 466 (Fla. Dist.Ct. App. 1975). Furthermore, despite the majority's contentions, any "leave of absence" granted Justice Diaz while in his term of office, as strictly provided for by statute, would have to be granted by the Governor. Miss. Code Ann. § 25-3-61.

¶189. As contemplated by the constitutional and statutory sections discussed above; a "leave of absence" does not constitute a "vacancy," "removal," and/or "disqualification" from office. Even during a "leave of absence," Justice Diaz still remains a Justice of this Court with that "authority" which was vested in him by the Constitution and Statutes of this State. It would be repugnant to his office to "void the votes and/or opinion" which he cast and prepared before his so-called "leave of absence." Any limits to the "authority" vested in him would most definitely have to be provided for and contemplated by the Constitution, Statute,

71

and/or a provision of the Internal Operating Procedure of this Court. Miss. Code Ann. § 9-3-61. None of the laws, rules, and/or procedures currently in place contemplate the limiting of Justice Diaz's "authority" to cast votes and/or prepare opinions as to those cases which were currently before this Court when his "leave of absence" took effect. His votes and/or opinions cannot be said to be "void" as he still retained the requisite "authority" to rule upon those issues. *See Ex parte Coffee*, 328 S.W.2d 283 (Tex. 1959).

¶190. Even with these principles declaring the law of the land, the majority has unilaterally determined, without a single vote being cast, to declare Justice Diaz's votes and/or opinions "void." What authority is such a declaration based upon? Clearly, if the legislature or this Court had meant for a "leave of absence" to trigger a "voiding" of votes and/or opinions; it would have been so provided by Statute or Internal Operating Procedure. One has to wonder why such a decision was made, if not for a tactical reason.

¶191. Additionally as alluded to by statute, a judge's absence from the bench is not viewed as a "vacancy." *See* Miss. Code Ann. §§ 25-3-57, § 9-1-105. Even the portions of our State Code which address public officers and employees recognize that a "personal leave" is not synonymous to "unemployment." *See* Miss. Code Ann. § 25-3-93. As such, we have even recognized that an employee who takes "maternity leave" is still employed for the purposes of unemployment and is not considered to have been voluntarily or involuntarily terminated. *Smith v. Miss. Employment Sec. Comm'n*, 344 So.2d 137 (Miss. 1977).

¶192. **"Leave of absence" connotes retainment of status and employment**. " '[L]eave of absence' is not that the one on leave is no longer a member . . . or is separated from the department, but rather that one person, while still a [member] in the department, is temporarily excused . . . " *Murray v. Board of Educ. of Washington Local Sch. Dist.*, 1986 WL 7629, at 7 (Ohio Ct. App. 1986) (quoting *State ex rel. Cutright v. Akron Civil Serv. Comm'n*, 120 N.E.2d 127, 130 (Ohio Ct. App.

1953)) (emphasis added). In an unrelated matter concerning the interpretation of when the Governor is "absent" for the purposes of whether the Lieutenant Governor may perform his duties; we stated, in relevant part, that:

> [The Governor] does not cease to be Governor by his temporary absence from the state. His vested right of tenure in the term of office attaches to his person and is distinct from his executive functions; it goes with him . . .

*Montgomery v. Cleveland*, 134 Miss. 132, 98 So. 111, 114 (1923).

¶193. Also important to this analysis are our holdings concerning a successor judge's authority to vacate his predecessor's orders and judgments. The most recent of such cases is *Amiker v. Drugs For Less, Inc.*, 796 So.2d 942 (Miss. 2000). Amiker filed a Complaint in the Circuit Court of the First Judicial District of Hinds County against Mixon and Drugs For Less, Inc, a Jackson, Mississippi pharmacy, alleging negligence and other claims resulting from injuries he received from the misfiling of his heart and hypertension medication. *Id.* at 943. During trial, the Amikers brought to the attention of Judge Coleman, the trial judge, that Drugs for Less had committed several discovery violations. *Id.* at 944-945. The jury returned a verdict in favor of Mixon and Drugs for Less. *Id.* at 944. The Amikers then filed a Motion for a Judgment Notwithstanding the Verdict and Motion for a New Trial and renewed an earlier Motion for Sanctions, all of which were based on the alleged discovery violations. *Id.* at 945. Judge Coleman "(1) set aside the judgment based on the jury verdict, (2) granted a judgment of liability against Drugs for Less, (3) granted the Amikers a new trial against Mixon as to liability and damages and against Drugs for Less as to damages only, and (4) awarded the Amikers reasonable and necessary attorney's fees of $51,542.94 against Drugs for Less." *Id.* at 945. Mixon and Drugs for Less then filed a Motion for Rehearing which was denied, as well as their appeal to this Court. *Id.* Thereafter, Judge Coleman retired and Judge Swan

Yerger was appointed to fill the vacancy. Mixon and Drugs for Less then filed a second Motion to Reconsider. Judge Yerger vacated Judge Coleman's Opinion and Order and rendered his own. Amiker then appealed. *Id.* **We held that Judge Yerger, as the successor judge, could not void and vacate Judge Coleman's order**. *Id.* at 946.

¶194. Our holding has an interesting application to the present circumstances. Just as Judge Yerger attempted to "void" Judge Coleman's Order and Opinion; so too the majority of this Court attempts to "void" Justice Diaz's votes and separate prepared opinions. It is without question, that matters for which no votes were taken before August 7, 2003, should be removed from Justice Diaz's control and he should not be allowed to enter a vote as he is on a "leave of absence." However, it does not follow that Justice Diaz's votes and opinions should be voided on cases for which votes had been taken and written opinions prepared before August 7, 2003. Under the circumstances, Justice Diaz's votes regarding this proceeding and others should be given effect.

¶195. I feel obligated to adopt Justice Diaz's prepared dissent and quote his reasoning below:

> I agree with the majority's statement that error occurred in this case. However, I do not agree that these errors should be cast aside as merely harmless. I disagree that such a determination is the moral or ethical thing for us to do. There are some cases where the result just feels wrong. In those particular cases, men, especially those of high character and responsibility, should be guided by their hearts, as well as by the law. In my opinion, this is such a case. The facts of this case and the manner in which the trial was conducted do not support the imposition of the death penalty. I would grant Byrom a new trial, at least on sentencing. Because the majority refuses to recognize that the effect of the errors, which it readily recognizes, was to deprive Michelle Byrom of her constitutionally guaranteed right to a fair trial, I respectfully dissent.
>
> The majority recognizes, as it must, that convictions upon indictments for capital murder and sentences of death must be subjected to heightened scrutiny where *all doubts are to be resolved in favor of the accused*. It quotes well-established precedent which makes clear that *what may be harmless error in a case with less at stake because reversible error when the penalty is death*. It appears this precedent is quoted simply for appearance sake, however, since the majority ignores it and dismisses numerous errors as harmless. In so doing, the majority errs.

In addition to the heightened scrutiny afforded sentences of death, we are also bound by cumulative error review. We have held that individual errors, not reversible in themselves, may combine with other errors to make up reversible error. *Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991); *Griffin v. State*, 557 So. 2d 542, 553 (Miss. 1990). The question under these and other cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial. *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987). In my opinion, the errors outlined below are numerous and significant enough to require reversal.

### Ineffective Assistance of Counsel

I feel constrained to begin my analysis of the errors in this case by commenting on the derelictions of Byrom's counsel. Basic trial and appellate responsibilities were neglected or inadequately performed. Necessary objections were not made, appropriate motions were either not made or not zealously pursued, error was not preserved, unwise trial strategy was employed, and the record was not properly developed. Also, the appeal filed on Byrom's behalf relies in large part on unsupported assertions and vague innuendo and falls below what I consider professionally acceptable. Standing alone, these mistakes might be considered harmless. However, I must conclude, based upon the very specific facts of this case and the heightened scrutiny mandated by precedent, that they combine with other errors to warrant reversal.

Not surprisingly, as Byrom's trial counsel prepared and argued her appeal to this Court, the issue of ineffective assistance was not raised in her appeal. However, despite the majority's apparent reluctance, this Court has the authority to consider the issue *sua sponte*. *Grubb v. State*, 584 So.2d 786, 789 (Miss.1991) (holding that plain error will allow an appellate court to address an issue not raised at trial if the record shows that error did occur and the substantive rights of the accused were violated.). Moreover, since her life is at stake, I consider it our duty as the court of last resort in this State to allow this aspect of Byrom's trial to influence our decision. *Porter v. State*, 732 So.2d 899, 902-05 (Miss.1999) (holding that violations of fundamental rights are subject to plain error review).

Claims of ineffective assistance of counsel carry a high burden. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It must be shown that counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687, 104 S.Ct. 2052. "Unless . . . both showings [are made], it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So.2d 468, 477 (Miss.1984) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Id.* at 477 (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

Additionally, to determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So.2d 426, 430 (Miss.1991). This means a "probability sufficient to undermine the confidence in the outcome." *Id.* The question here is whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068; *Burns v. State*, 813 So.2d 668, 673-74 (Miss.2001).

The standard for considering ineffective assistance of counsel is same for appellate performance as it is for trial performance. *Foster v. State*, 687 So.2d 1124 (Miss.1996). U.S.C.A. Const.Amend. 6.

I preface the following discussion by saying that what I perceive as counsels' deficient performance, standing alone, might not meet the *Strickland* standard. However, because I review counsels' actions and inactions with the heightened scrutiny afforded sentences of death, and because I also must consider the cumulative effect of the errors noted in this issue and those in the issues to come, I conclude that counsels' deficient performance combined with other errors to deny Byrom the right to a fair trial.

*Counsels' Deficient Performance During Trial.*

Byrom's counsel failed to zealously pursue basic trial responsibilities. Counsel failed to make proper objections and preserve error for Byrom's appeal. A contemporaneous objection is necessary to preserve the right to raise an error on appeal. Where no objection is made, the error is deemed waived. *McQuarter v. State*, 574 So.2d 685, 688 (Miss.1990). This procedural rule places a burden on counsel to be prepared for trial and attentive to what occurs at trial. *Roberson v. State*, 595 So.2d 1310, 1315 (Miss.1992).

Byrom's counsel failed to object to hearsay testimony regarding Byrom's doctor's out-of-court statement that Byrom's medicine would not affect her ability to understand and respond to LEO's questions. These statements prejudiced Byrom because it gave her statements to LEO, almost all of which commenced following deficient *Miranda* warnings, more validity than they would have had.

The voluntariness of Byrom's confessions were questioned by defense counsel, who argued that Byrom did not understand her rights. However, allowing the introduction of otherwise inadmissible statements concerning Byrom's lucidity weakened this argument. I am not suggesting that defense counsel should have misrepresented Byrom's state of mind; however, counsel should have done everything within ethical constraints to call these

confessions into question, including objecting to inadmissible evidence which weakened her argument.

On appeal, counsel claims error in certain jury instructions, but no objections were made to them at trial. Counsel also brings a host of objections to the sufficiency of the indictment, but they were not all presented for the trial judge's consideration. "Our law is clear that an appellant must present to us a record sufficient to show the occurrence of the error he asserts and also that the matter was properly presented to the trial court and timely preserved." *Acker v. State*, 797 So. 2d 966, 977 (Miss. 2001) (quoting *Lambert v. State*, 574 So. 2d 573, 577 (Miss. 1990)). Counsel has also failed to cite relevant authority in support of these procedurally barred issues. "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001) (citing *Williams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998)).

Counsel also claims error in the trial judge allowing the State to argue that Gillis was in jail awaiting trial; however, again no contemporaneous objection was made. It is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court and the failure to do so constitutes a procedural bar. *Johnson v. State*, 477 So.2d 196, 209-10 (Miss.1985). *See Wilson v. State*, 234 So.2d 303, 308 (Miss.1970); *Aldridge v. State*, 180 Miss. 452, 456, 177 So. 765 (1938); *Matthews v. State*, 148 Miss. 696, 701, 114 So. 816 (1927).

During trial, Byrom requested a psychiatric evaluation. The judge ordered that Dr. Criss Lott would evaluate all three defendants. Defense counsel objected, arguing that having the same doctor examine all three defendants increased the likelihood that the results would be mingled. Despite these fears, counsel did not withdraw Byrom's request for an evaluation. Counsel also fails to cite any authority for the proposition that appointing the same doctor for all three defendants was erroneous.

Following the examination, counsel advised the State of their intention of using Dr. Lott's report at trial, but resisted disclosure of the reports, arguing, inter alia, that the report should not be disclosed because it was conducted without her consent. The trial judge required disclosure of the report to the State. Counsel alleges on appeal that a letter was mailed Dr. Lott (and copied to the trial judge) wherein Byrom's consent was withdraw; however, this letter is not included for our review, nor was it presented to the trial judge. If counsel believed having the same doctor conduct all of the examinations was so prejudicial to Byrom's case, then the request for an evaluation should have been properly withdrawn, and any proof that it was conducted without her consent should have been presented for our consideration. "Facts asserted to exist must and ought to be definitely proved and placed before us by a record, certified by law; otherwise, we cannot know them." *Mason v. State*, 440 So.2d 318, 319 (Miss.1983).

At trial, the judge delayed disclosure to the State of Byrom's psychiatric reports until Byrom could file specific objections thereto. Counsel never filed any. The failure of counsel to present a properly developed record and meaningful argument is recurrent, and

it is prejudicial to Byrom. We cannot fully consider Byrom's issues and render an educated opinion without the complete assistance of counsel.

During pre-trial hearings, Byrom's counsel moved for a change of venue, but after the trial judge reserved ruling on the motion, counsel apparently abandoned the motion, never making a formal motion for a change of venue. Byrom admits in her brief that her counsel erroneously believed that the court had ruled adversely on Byrom's motion. If, as Byrom asserts, local interest and opinion made Tishimingo County a bad venue, then moving the trial to another county would have been beneficial to Byrom, and a fortiori, leaving it there was prejudicial.

"A motion for change of venue 'must be in writing and supported by affidavits of two or more credible persons showing that the defendant cannot receive an impartial and fair trial in that particular county because of prejudgment of the case or grudge or ill will to the defendant in the mind of the public.'" *Gray v. State*, 799 So. 2d 53, 62 (Miss. 2001) (quoting *Davis v. State*, 767 So. 2d 986, 993 (Miss. 2000). None of these requirements were complied with, and beyond vague assertions, no evidence that the jury failed to be fair and impartial has been presented by defense counsel. Without meaningful argument and a properly developed record, we are unable to fully review this issue.

During cross-examination of Eric Byrom, counsel sought to impeach Eric with his taped statement. Because counsel's impeachment attempt was not preceded by sufficient foundation it was properly disallowed by the trial judge. However, the judge ruled that he would allow counsel to point out any inconsistent statements made by Eric. But when Eric made inconsistent statements, defense counsel did not refer to the inconsistency.

Byrom's theory of the case was the Junior killed his father without help from Gillis or encouragement from Byrom. She sought to introduce a home video depicting her engaging in a sexual act to demonstrate Byrom Sr.'s abusive nature. As discussed later in this opinion, I believe it was error to refuse this tape because its relevance, if it depicts the abuse Byrom suffered, is significant.

Although they assert on appeal the exclusion of the tapes during both phases of the trial as erroneous, Byrom's attorneys stated at trial that they only wanted to show the tape during the sentencing phase, effectively waiving Byrom's right to use the tape during the guilt phase. The failure to present the issue of the admissibility of the tapes during the guilt phase was prejudicial to Byrom because it raises a procedural bar here. *See Evans v. State*, 725 So. 2d 613, 632 (Miss. 1997). The tape is probative evidence as to Junior's motivation for killing his father without any encouragement from his mother. An attempt should have been made to show it to the jury during the guilt phase as well.

Moreover, although the trial judge ruled that no pornographic evidence would be shown to the jury, he added that if Byrom would reduce the home video images to a still frame, he would consider allowing the still images into evidence. Byrom's attorney did not bother to comply with this suggestion and the images were never seen by the judge or the jury.

Counsel also made unwise trial decisions that prejudiced Byrom. Counsel called no witnesses on Byrom's behalf during either the guilt or sentencing phases of the trial. Although complaints of uncalled witnesses are typically not favored since presentation of

testimony is generally a matter of trial strategy, ***Boyd v. Estelle***, 661 F.2d 388, 390 (5th Cir.1981), the failure to call available witnesses on critical issues is a factor to be considered in analyzing an ineffective assistance claim. ***Leatherwood v. State***, 473 So.2d 964, 970 (Miss.1985).

Byrom's physical and mental disorders were the most critical issues in her sentencing phase and more should have been done to demonstrate them to the trier-of-fact. I find it hard to believe that Byrom's best interest were furthered during the sentencing phase by merely presenting psychiatric reports. Surely there were character witnesses who could have been called on her behalf. Surely Byrom's doctors could have been called to testify regarding her mental and physical health conditions. Surely their in-court testimony would have been more illuminating than confusing medical reports and evaluations.

Byrom waived her right to be sentenced by the jury and requested that the judge sentence her. I do not know whether this was done on the advice of counsel or the insistence of Byrom. I also do not know whether the defense had reasons to believe that the jury would sentence Byrom to death, perhaps their body language signaled disdain for Byrom. Whatever the reason was, I do not know. However, I do not believe that a jury appraised of the information before us would not have sentenced Byrom to death.

I recognize that these conclusions are drawn from a cold and incomplete record, without the benefit of personally observing the demeanor of the jurors. I also recognize the deference normally afforded to trial counsels' strategic decisions. However, the incompleteness of the record is primarily attributable to Byrom's counsel. The deference afforded to the attorneys' trial strategy is lessened when so many other errors are present. Moreover, the heightened scrutiny applied to death penalty cases warrants a weaker deference than is normally afforded to trial counsel's strategic decisions. This type of review is wholly consistent with our policy of resolving reasonable doubt in favor of one whose death the prosecution demands. *See*, *e.g*., ***Fisher v. State***, 481 So. 2d 203, 220 (Miss. 1985); ***Fairchild v. State***, 459 So. 2d 793, 801 (Miss. 1984); ***Moffett v. State***, 456 So. 2d 714, 720 (Miss. 1984); ***Williams v. State***, 445 So. 2d 798, 814 (Miss. 1984); ***Gambrell v. State***, 92 Miss. 728, 736, 46 So. 138 (1908).

During oral argument of this matter, counsel was asked why it was decided to waive Byrom's right to have the jury sentence her. Counsel's response, that he felt they already had enough reversible error, speaks volumes on the issue of ineffective assistance of counsel.

*Counsels' Deficient Performance on Appeal.*

As during her trial, Byrom did not receive the zealously advocacy to which she is entitled during her appeal. The brief filed on her behalf was inadequate and the submitted record incomplete. These deficiencies prejudiced her case because we have been unable to completely review the issues presented.

With all due respect to Byrom's counsel, whose intentions were no doubt admirable, the brief that was filed on her behalf falls below what I consider professionally acceptable. The recurring failure of Byrom's counsel to adequately brief issues is a factor I have considered in concluding that Byrom's counsels' performance was deficient.

Throughout her brief, Byrom's counselors have made unsupported allegations and failed to cite relevant authority, or any authority whatsoever in many instances. Error has been claimed, but no prejudice demonstrated, or even alleged in many cases.

Byrom's brief was roughly half the size of the State's submitted brief and the written opinion of this Court. After the State filed a well-reasoned response which called into serious question many of the allegations in Byrom's brief, her attorneys did not even bother to file a reply brief. Though I do not propose to set an appropriate page limit or require that attorneys file a reply brief, I must conclude that, in this particular case, where the defendant's life is at stake, more should have been done.

Counsel also failed to properly argue the insufficiency of the evidence against Byrom. Though allusion to this argument is couched in other arguments, it was not raised as an independent issue, nor was the trial judge's failure to grant Byrom's motion for a directed verdict specifically asserted as erroneous.

Counsel failed to provide this Court with an adequate record. Though Byrom alleges to have sent a letter to Dr. Lott and the trial judge wherein she withdrew her consent for Dr. Lott's psychiatric examination of her, this letter was not made a part of the record. Byrom also alleges that, after she was sentenced, Junior confided in Dr. Lott that he had shot Byrom, Sr. However, no affidavit from Dr. Lott or any other information to support this allegation is included in the record.

A reviewing court does not act upon innuendo and unsupported representation of fact, *Gerrard v. State*, 619 So.2d 212, 219 (Miss.1993), or upon assertions in briefs, but is bound by the matters contained in the official record. *Saucier v. State*, 328 So.2d 355, 357 (Miss.1976). Though we are not required to address these issues that are not argued or supported with authority or citations to the record in Byrom's brief, *Edwards v. State*, 800 So. 2d 454, 468 (Miss. 2001); *Gerrard v. State*, 619 So.2d 212, 219 (Miss.1993), I have done so where able because of the severity of the sentence imposed. However, Byrom's counsels' failure to provide the Court with a complete record or present meaningful argument on her behalf has made it impossible for us to fully review many of her issues.

The inadequateness of Byrom's brief prejudices her in many ways. Without proper guidance from the parties who were part of this process, this Court is forced to review a cold record with a fine tooth comb, searching for errors. This is not the job of this Court, it is the job of the appellant. *Hoops v. State*, 681 So.2d 521, 526 (Miss.1996); *Kelly v. State*, 553 So.2d 517, 521 (Miss.1989); *Brown v. State*, 534 So.2d 1019, 1023 (Miss.1988); *Harris v. State*, 386 So.2d 393 (Miss.1980). We require that counsel not only make a condensed statement of the case but also support propositions with reasons and authorities in each case. *Kelly v. State*, 553 So.2d 517, 521 (Miss.1989). Though we do not shrink from any duty to pass upon any case, we feel like when called upon to do so we should have the aid and assistance of those who have brought the case here. *Henson v. State*, 108 So. 719, 720 (Miss. 1926). Their personal knowledge and description of the case is an indispensable aspect of our review. "[T]ruth is best discovered by powerful statements on both sides of the question. The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case

will best promote the ultimate objective that the guilty be convicted and the innocent go free.'" ***U.S. v. Cronic***, 466 U.S. 648, 655, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984) (quoting ***Herring v. New York***, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975)). When Byrom's brief is viewed as a whole, it is obvious that counsel has failed to perform this basic duty.

The aforementioned constitute a summary of the examples of deficient performance that I have found in the record, there may be others. My point on this issue is not that every criminal defendant whose attorney fails to make an appropriate objection or file the proper motion has adequate grounds for reversal. I do, however, intend to make clear that ineffective assistance of counsel is among the errors which should be considered in a cumulative error analysis. These malfeasances on the part of Byrom's attorney fall on the low end of the ineffective assistance scale. They are not severe, nor do they appear intentional. Were there no more error, I would find them insufficient to warrant reversal. However, I would hold, on the very specific facts of this case, that the level of zealously advocacy to which Byrom and every criminal defendant is entitled was not reached in this case and this deficiency combines with the other errors present to warrant reversal.

## Exclusion of the Home Video

An important aspect of Byrom's defense was that her actions were motivated by the abuse she suffered at Byrom Sr.'s hands. She has alleged that a large part of this abuse was sexual, and she has alleged that this tape depicted this sexual abuse. If the contents of this tape do help to establish that Byrom was indeed forced to perform sexual acts for the gratification of her husband, then it should not have been excluded. Moreover, the trial judge excluded the tape without even viewing it. This I cannot condone.

The majority rationalizes this error by concluding that Byrom was given sufficient latitude to convey her theory of abuse to the jury through other evidence. However, the majority fails to recognize the questionable nature of the evidence that was presented to establish Byrom Sr.'s abusive nature. This evidence was presented through the testimony and statements of Byrom and Junior, whose credibility was questionable at best, considering their respective motivations. If the home video depicts Byrom Sr. forcing Byrom to engage in non-consensual sexual events then it would have given more credibility to these allegations as it would have provided reliable evidence that she was in fact abused. This evidence is therefore more probative on the issue of abuse than is the commercial tape. This home video makes more plausible Byrom's allegations that she suffered from domestic abuse, while the other only restates what was already obvious, that Byrom Sr. liked pornography. While credible proof that she was sexually abused certainly does not exonerate Byrom nor condone her actions, it does go to mitigation and should not have been excluded. Byrom should not have been prevented from proving her defense and to do so was error.

## Limiting the Cross-Examination of Witnesses

I would also hold the trial judge in error for limiting Byrom's cross-examination of Officer Edmondson regarding his knowledge of the ***Miranda*** rights. It was erroneous to disallow this line of questioning not only because it was valid impeachment material, but

also because it went to the pertinent issue of the voluntariness of Byrom's confession. This questioning of Deputy Edmondson was not designed merely to impeach his testimony and credibility, it was designed to show that *Byrom did not know her Miranda rights because Deputy Edmonson did not recite them properly*. Whether Byrom understood her rights was a crucial issue and the disallowance of this line of questioning was, and remains, erroneous.

The trial judge also committed error by improperly limiting Byrom's cross-examination of Sheriff Smith. Sheriff Smith had testified that Junior told the police all they needed to know about the plot to kill Byrom Sr. during his initial interview; however, no record of this interview, other than the Sheriff's report, was made. The Sheriff's report contained only a one-sentence recount of Junior's interview. Byrom's counsel was not permitted to question Sheriff Smith regarding any additional information he learned from Junior.

On the subject of cross-examination, this Court said in *Prewitt v. State*, 156 Miss. 731, 735, 126 So. 824, 825 (1930):

> It is of the utmost importance in the administration of justice that the right of cross-examination be preserved unimpaired. It is the law's most useful weapon against fabrication and falsehood. As a test of the accuracy, truthfulness, and credibility of testimony, there is no other means as effective. In this state, cross-examination is allowed coextensive with the issues, *Walton v. State*, 87 Miss. [296] 303, 39 So. 689; not only, but it may proceed into the collateral circumstances surrounding, or in any way affecting, the transaction to the full extent that they have relevant connection by way of testing the memory, accuracy, sincerity, interest, or bias of the witness. In all these matters the privilege of counsel rightfully has broad latitude, *and, to make it fully effective towards the purposes for which the law allows and favors it, the privilege should not be interfered with or hampered or restricted by the trial judge, except in clear case of irrelevancy*, trespass beyond admissible ground, or extremes of continual, aimless repetition. 1 Thomp. on Trials, §§§§ 406, 415-419. In several instances in this record, as it appears to us, the privilege was unduly and materially embarrassed by the trial judge; and this feature, taken together with the error first mentioned, makes it our duty, as we view it, to reverse the judgment and remand the case for a new trial.

*Id.* at 825 (emphasis added).

"One accused of a crime has the right to broad and extensive cross-examination of the witnesses against him . . . ." *Suan v. State,* 511 So.2d 144, 148 (Miss.1987); *see also Foster v. State*, 508 So.2d 1111 (Miss.1987); *Miskelley v. State*, 480 So.2d 1104, 1108-12 (Miss.1985); *Myers v. State*, 296 So.2d 695, 700 (Miss.1974). Not only is this right secured by our rules of evidence, Miss. Rules of Evid., Rule 611(b), but

it is also a function of the confrontation clauses of federal and state constitutions. U.S.C.A. Const. Amend. 6; Miss. Const. §§ 26.

The trial court should have permitted Byrom's counsel to cross examine Sheriff Smith regarding Junior's interview. It is true, as the State points out, that the testimony occurred during a suppression hearing. However, as Byrom points out, the motion which necessitated the hearing was also one to compel discovery. The substance of this interview was thus relevant insofar as it dealt with a statement by one of the State's star witnesses that had not been provided to the defense.

This limitation by the trial judge is another example of how Byrom was denied the opportunity to develop and present her theory of the case. It is plausible to assume that more information was revealed by Junior during this interview than the two sentences contained in Sheriff Smith's report. Byrom should not have been so limited in questioning Sheriff Smith or Deputy Edmondson, and to limit the development of her case in this manner was error.

### Exclusion of the Jailhouse Letters

I also find error in the exclusion of the jailhouse letters written to Byrom by Junior. This Court warned trial courts against imposing the preclusion sanction in ***Houston v. State***, 531 So. 2d 598, 612 (Miss. 1988) stating: "[g]enerally, it ought to be reserved for cases in which the defendant participates significantly in some deliberate, cynical scheme to gain a substantial tactical advantage." ***Houston***, 531 So.2d at 612; *see also **Taylor v. Illinois***, 484 U.S. 400, 414-15 (1988). I would hold the failure to disclose in the case at bar did not warrant complete exclusion of the letters. The conclusion of Byrom's counsel that they were not required to disclose these letters was plausible, considering the wording of the various rules and precedent, and the fact that they intended to use them only for impeachment. This is not a situation where the discovery abuse was wanton or deceitful. Defense counsel apparently had an honest belief that withholding the letters from the State was allowed under the rules and case law of this State. In fact, the trial judge eluded to the confusion in the Bar regarding the rule on this issue, stating "I think it's time for the Supreme Court of this state to decide what the law is."

A violation of Rule 9.04 is considered harmless error unless it affirmatively appears from the entire record that the violation caused a miscarriage of justice. ***Buckhalter v. State***, 480 So.2d 1128, 1128 (Miss.1985); ***Prewitt v. State***, 755 So.2d 537, 540-41 (Miss. Ct. App. 1999). The State, and the majority, submit that Byrom was not prejudiced by the exclusion of these letters. They argue that Byrom's counsel was allowed to ask Junior if he remembered writing every statement in the letters and that Junior admitted writing letters to his mother in which he told her that there was no conspiracy and that he alone killed his father.

It is true that defense counsel was allowed to ask Junior whether or not he made all of the statements in the excluded letters. Though he denied making some of them, the ultimate fact that Byrom sought to prove through their introduction, that Junior wrote his mother that he personally killed his father, was admitted by Junior in open court. Thus, the excluded evidence was essentially before the jury.

However, the letters remained admissible to the extent that Junior denied making the statements contained therein. *See* **Johnson v. State**, 655 So. 2d 37, 41 (Miss. 1995) (setting forth foundation necessary for impeachment evidence). Junior denied writing his mother:

> that he went to his father's door, opened it, peeked in, and saw his dad asleep. That he then took two steps, screamed, and when he heard movement, he began firing. Then he went to town, found Gillis, and told him to hide the gun in a spot in the woods where they previously had hidden drugs.

Under Rule 613 (b), Byrom should have been allowed, following these denials, to introduce the letter wherein he made these statements to impeach Junior's trial testimony.

Junior's admissions on the stand may have been discredited by the jury, who may have seen them as a result of the cross-examination skills of Byrom's counsel rather than as truthful statements of past admissions. If Byrom had been allowed to present Junior with the letter that he denied writing, the jury would have known that he was not telling the whole truth. This, coupled with the evidence that Junior had gunshot residue on his hands, whereas Gillis did not, may have made it less likely to the jury that Gillis committed the murder and thereby made it more likely they would have found that Byrom's act of conspiring to pay for her husband's murder was unproductive. The trial court abused its discretion in refusing to allow Byrom to impeach Junior once he made statements contradictory to those in the letters.

## Error in the Jury Instructions

I also consider it error to instruct the jury that it could convict Byrom if it found that she caused the death of Byrom Sr after "having been offered or having received something of value, for the murder or was a party to such offer or receipt of anything of value" for the murder. There was no evidence presented at trial that Byrom was ever offered anything for the murder of Byrom Sr.

The majority's reliance on **Nixon v. State**, 533 So. 2d 1078 (Miss. 1987), is misplaced because that case is distinguishable from the case at bar. In **Nixon**, the defendant was the person *who had been offered money* to commit murder; therefore, the instruction given, which tracked the language of the statute, applied squarely to the facts and evidence presented at the trial. In the case sub judice, Byrom was prosecuted for being *the person who offered money to another* in payment for that other person committing a murder. Therefore, **Nixon** does not, by itself, constitute sufficient precedent for dismissing Byrom's argument.

This Court held in **McBroom v. State**, 64 So.2d 144 (Miss.1953), that "[a]n instruction not based on evidence is erroneous in that it introduces before jury facts not presented and *is well calculated to induce them to suppose that such state of facts, in court's opinion, is possible under the evidence and may be considered by them.*" (emphasis added). Although finding the evidence sufficient to support the conviction, this Court reversed and remanded the defendant's grand larceny conviction because the trial court granted the State's instruction on aiding and abetting even

though there was no evidence in the record to support the instruction. *See also **Craft v. State***, 214 Miss. 752, 59 So. 2d 343 (Miss. 1952) (holding an instruction authorizing the jury to convict a defendant as an accessory was prejudicial in the absence of evidence that such defendant had aided and abetted co-defendant in commission of a larceny, and in absence of evidence that co-defendant had in fact committed the larceny).

This Court has held repeatedly that to grant jury instructions that are not supported by the evidence is reversible error. *See **Clark v. State***, 693 So.2d 927 (Miss.1997); ***Givens v. State***, 618 So.2d 1313 (Miss.1993); ***Lancaster v. State***, 472 So.2d 363 (Miss.1985); ***Phillips v. State***, 794 So.2d 1034 (Miss.2001); ***Walker v. State***, 740 So.2d 873 (Miss.1999). "A circuit judge has a responsibility to see that the jury is properly instructed." ***Duvall v. State***, 634 So.2d 524, 526 (Miss.1994) (internal citations omitted). In the case sub judice, the circuit judge failed in that responsibility. If to give an instruction that is not supported by the evidence can be held sufficiently erroneous to justify reversal of a grand larceny conviction wherein the defendant was sentenced to five years in the penitentiary, *see **McBroom***, *supra*, then it should also be sufficient to reverse a capital murder conviction wherein the defendant has been sentenced to death.[20]

It is true that this instruction, to be erroneous, must still have influenced the jury's verdict; otherwise, it is harmless error that does not warrant reversal. However, "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." ***Irving v. State***, 361 So.2d 1360, 1363 (Miss.1978); *see also*, ***Fisher v. State***, 481 So.2d 203, 211 (Miss.1985) (quoting ***Irving***); ***Porter v. State***, 732 So.2d 899, 902 (Miss.1999). There was substantial evidence to convict Byrom of having "offered something of value for the death of Edward Byrom, Sr.". Conversely, there was absolutely no evidence presented that even suggested that Byrom "was offered or received something of value" for the murder. I must conclude that this error, though perhaps harmless standing alone, combines to warrant reversal.

### Error in Sentencing Byrom to Death

I must also conclude that the trial judge erred by sentencing Byrom to death. The majority concludes that the trial judge *considered* all of Byrom's mitigation evidence. Perhaps he did, but I do not believe he gave it appropriate consideration. Despite the formal sentencing order quoted in full by the majority, I find the judge's at trial comment telling. After mentioning that in his decision he considered Byrom's mitigation factors numbers (1) & (2), the trial judge stated, "[p]arenthetically, the Court would observe that these factors are *the only factors suggested which would appear and bear consideration* by this Court." (emphasis added). I disagree with this assessment.

---

[20]The language of this instruction is identical to that of the indictment, which Byrom also challenged. I agree with the majority that no error occurred in the refusal to quash the indictment. The difference here is that the function of the indictment was only to inform the defendant of the charges against her, whereas here, this language went to the jury and could have affected its verdict.

The two mitigation factors that the trial judge decided "did not bear consideration" are specifically listed in § 99-19-101 (6) (c) and (6) (f), respectively, as statutory mitigation factors. In support of these mitigation factors, Byrom introduced the reports of both Drs. Caruso and Lott, which described Byrom's emotional and mental problems in detail. The reports also chronicled Byrom's history of sexual, mental, and physical abuse at the hands of Byrom, Sr. Though this evidence came from Byrom personally and is not definitively established elsewhere, testimony at trial did establish that Byrom, Sr. physically abused Byrom and one of Junior's friends in public on at least one occasion. Junior also testified that Byrom, Sr. physically abused him on other occasions and that after one such instance Junior took the gun used to kill Byrom, Sr. and planned to use it if his father hit him again. Junior also testified that his father drank on a daily basis, and was "a totally different person when he drank." Junior further testified that in the six months before the murder there were between three and four cursing fights a week between his parents. Byrom Sr.'s abusive nature was demonstrated at trial and the trial judge's failure to consider it was error. *See Jenkins v. State*, 607 So.2d 1171 (Miss. 1992) (holding that victim characteristics evidence was admissible during penalty phase of capital murder prosecution; the evidence was proper and necessary to development of case and true characteristics of victim and could not have served in any way to incite jury).

Dr. Caruso indicated it was his professional opinion that Byrom's "capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law was substantially impaired by her Major Depression, Dysthymic Disorder, Alcohol Dependence, Alcohol Intoxication and Borderline Personality Disorder." This is also a statutorily-prescribed mitigation factor. *See* §§ 99-19-101 (6) (f). The failure to consider this factor was also reversible error.

Dr. Caruso also indicated four additional mitigating factors, to-wit, (1) the defendant's history of physical, sexual, and emotional abuse was severe enough to cause her to develop Borderline Personality Disorder and Munchausen's Syndrome, which are markers for severely impaired coping; (2) the defendant's history of abuse modeled violence as problem solving; (3) the defendant's history of abuse left her prone to strike out violently at abusive men, such as the victim; and (4) in addition to Munchausen's Syndrome, the defendant also suffers from significant disabling medical problems.

Byrom's other ailments include: lupus, pneumonia, bilateral hip replacement, and severe depression. Several of her health problems are a direct result of her ingestion of rat poison, which, in our opinion, dramatically illustrates her psychological problems. Indeed, Dr. Caruso stated, "[t]his rare and puzzling psychiatric disorder indicates that [Byrom's] usual circumstances are so intolerable that she chooses to become a patient, even when that entails undergoing painful diagnostic procedures."

While the foregoing factors may not be among those listed in § 99-19-101 as statutory mitigating factors, this Court has held that all evidence relevant to mitigation should be presented to the sentencing body. *See Carr v. State*, 655 So.2d 824 (Miss. 1995) (pointing out that the United States Constitution requires that jury not be precluded from considering any aspect of defendant's character or record or any circumstances of offense as mitigating factors.); *Willie v. State*, 585 So.2d 660 (Miss.1991) (judge may

not preclude jury from considering, in mitigation, any aspect of defendant's character or record or any circumstance of the offense; the only requirement to introducing evidence at the sentencing phase is that it must be relevant); *Mackbee v. State*, 575 So.2d 16, 39 (Miss.1990) (This Court has held that the jury must have as much information as possible when it makes its sentencing decision. Mississippi allows evidence of a mitigating circumstance of an unlimited nature).

Considering that all doubt is to be resolved in favor of Byrom, I must conclude that the trial judge failed to fully consider and give appropriate weight to all of Byrom's statutory mitigation factors as well as her non-statutory mitigating factors. Byrom is a woman with numerous mental and health problems who lived in an abusive home. She has alleged that her husband forced her to have sexual encounters with persons outside their marriage and that he regularly physically abused her. She has alleged that she was afraid to leave him, that she was afraid for herself and her son, who the evidence indicates was also a victim of abuse at the hands of his father. I do not herein advocate that we should forgive or forget the severity or the crime for which Byrom was convicted, nor should we allow her to escape punishment for the inhumane way in which she bargained away the life of her husband. However, at the same time, we should not forget the reasons why she made such a decision, the factors which led to this final and regrettable decision. Michelle Byrom should be punished. However, based upon the particular facts of this case, and in light of the substantial mitigating evidence presented by Byrom and the evidence suggesting that perhaps Junior, and not Gillis, killed Byrom, Sr., I do not believe that the death penalty was warranted in this case.

## Conclusion

Heightened scrutiny is afforded death sentences. Cumulative error will cause harmless errors to be reversible. What may be harmless error becomes reversible error when the penalty is death. These are not hollow phrases with no meaning. They are the standard of our review, and I believe in them. The majority fails to follow this established precedent. Instead, it looks to the evidence of Michelle Byrom's guilt and decides that errors committed must be harmless. These standards of review apply to everyone, even those whose guilt seems obvious. I would reverse the conviction and remand for a new trial, or re-sentencing at a minimum. I dissent.

¶196. For these reasons as ably stated by Justice Diaz in his prepared dissent, I would reverse and remand for a new trial. Accordingly, I dissent.

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*, 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999).

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).        *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).


*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. Sate,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

## DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE
### (continued)

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## <u>FOR RESENTENCING TO LIFE IMPRISONMENT</u>

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

   ***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State*** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

   ***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi,*** 494 U.S. 1075 (1990) vacating and remanding, ***Pinkney v. State,*** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

   ***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

   ***Jones v. State***, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi,*** 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.